LOUISIANA–PACIFIC CORPORATION

v.

The UNITED STATES.

No. 191–79C.

United States Court of Claims.

July 29, 1981.

Alan I. Saltman, Washington, D. C., atty. of record, for plaintiff. Gary G. Stevens, Saltman & Stevens, P. C., Washington, D. C., of counsel.

Benjamin F. Wilson, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant. James Perry, Dept. of Agriculture, Washington, D. C., of counsel.

Before SKELTON, Senior Judge, and KASHIWA and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This claim for breach of contract is before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. Plaintiff claims an alleged illegal partial cancellation of a timber sale contract by the Forest Service of the United States Department of Agriculture. We deny the motions for reasons which follow. The essential facts leading up to the dispute and this lawsuit will first be stated.

On May 4, 1973, the plaintiff, Louisiana-Pacific Corporation, executed a Third-Party Agreement with Northern Timber Company, Inc., by which it assumed the benefits and responsibilities of timber sale contract No. 9–451, a contract Northern Timber had entered into with the defendant on June 13, 1972. The contract was for the sale of an estimated 11 million board feet (designated in the contract as 11,000 MBF (thousand board feet)), and permitted the buyer to harvest timber on the Red Rock sale area of the Deerlodge National Forest, Montana. This agreement was approved by the Forest Service on June 8, 1973.

On May 25, 1973, the Upper Missouri Group of the Sierra Club filed a notice of appeal and petition for stay with the Chief of the Forest Service for a stay of all harvesting and road construction on the Red Rock timber sale. The Forest Service denied the petition on June 14, 1973. However, as a result of public interest, a Forest Service regional office task force reviewed the sale and recommended a bilateral modification to eliminate portions of the sale and the inventoried roadless area, and to redesign the roads and cutting unit boundaries.

On October 1, 1973, before plaintiff had cut any trees, the Forest Service mailed plaintiff a proposed bilateral modification of the contract which reduced the volume established in the original contract from 11,000 MBF to 8,520 MBF, reduced the gross acreage and cutting area from 5,386 acres to 4,879, and increased the temporary road construction by 2.5 miles. The proposed modification reduced the maximum stumpage rate, however, from $64.08 per MBF to $57.64 per MBF.

On January 11, 1974, plaintiff submitted a counterproposal to the Assistant Regional Forester. This counteroffer was limited to one element: a further reduction in the stumpage rate, by $12.29 per MBF, that would more closely approximate the Forest Service's reduction in the amount of timber that the plaintiff was entitled to cut and to compensate it for increased road construction costs and lost profits.

On March 8, 1974, the Chief of the Division of Timber Management, Region I, advised plaintiff of the Forest Service's response to the counteroffer, obtained directly from the Chief of the Forest Service. This response informed plaintiff of the following:

(1) Louisiana-Pacific's counteroffer to further reduce the maximum stumpage rate by an amount commensurate with the reduction in timber volume was "not acceptable";

(2) the Forest Service stated its refusal "to accept any modification by Louisiana-Pacific signed under protest or with qualification"; and finally that

(3) unless the Forest Service's modification of the contract was signed "as presented," it would "cancel the sale" and terminate the contract.

On April 25, 1974, without written protest or reservation of any rights, plaintiff signed and returned the Forest Service's Agreement to Modify Contract. Plaintiff did not appeal the decision to modify, as permitted by Forest Service regulations. 36 C.F.R. § 211 (1974). Plaintiff did express its dissatisfaction to various Forest Service officials from time to time. On March 2, 1978, plaintiff filed its first formal written claim for damages, in the amount of $169,962, with the Forest Service. On March 21, 1978, the defendant denied this claim.

On May 10, 1979, plaintiff filed this action, claiming that the contract modifications were agreed to by plaintiff under duress and thus were void, that defendant did not act in good faith, and that the modifications should be deemed unenforceable on the basis of unconscionability. The petition asks for judgment of $115,000 "constituting Plaintiff's unamortized road costs, as well as its loss of anticipated profit." Plaintiff does not claim that the modified contract was unprofitable or performed at a loss. On July 12, 1979, the defendant filed its answer. Among other matters, it raised three affirmative defenses: accord and satisfaction, waiver, and failure to state a claim for relief within the jurisdiction of this court.

The plaintiff filed its motion for summary judgment on December 6, 1979, and defendant filed the cross-motion for summary judgment on March 11, 1980. In its cross-motion, the defendant raised the issue of "frustration" for the first time. In this connection, defendant contends that the Government is charged by law with the responsibility and duty to preserve and conserve the national forests, which it claims was the purpose of the timber sale contract involved in this case, and this purpose would have been frustrated due to damages to the environment had the contract been carried out pursuant to its original terms. Therefore, the defendant says that the modification of the contract by the Forest Service was not a breach of contract.

■■■ It is hornbook law, of course, that the Government cannot terminate or change one of its contracts in whole or in part without consent of the other contracting party, without being held liable in damages for breach of contract. Such unilateral action would also breach the implied duty to deal in good faith and not to hinder the performance of the contract. *G.L. Christian & Associates v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); *WRB Corp. v. United States*, 183 Ct.Cl. 409 (1968). Many government contracts contain a termination clause spelling out the procedures for a proper termination for the Government's convenience. However, in this particular contract, standard clause B8.3 provides that, except for circumstances set forth in clause B8.31, not relevant here, the contract could be modified only upon written agreement of the parties. Defendant got that written agreement here but now plaintiff says duress upon it renders the modification void. If so, there was no accord and satisfaction or waiver which defendant relies upon. Thus, there is presented a disputed question of fact we cannot resolve on the pending motions. This may be seen clearly when we consider the three tests for identifying duress as set forth in *Fruhauf S.W. Garment Co. v. United States*, 126 Ct.Cl. 51, 111 F.Supp. 945 (1953), and in many subsequent cases, as follows:

(1) One side involuntarily accepted the terms of another.

(2) Circumstances permitted no other alternative.

(3) The circumstances were the result of coercive acts of the opposite party.

■■■ Plaintiff tells us that it needed lumber, which was getting scarce, so it agreed to the modification although it did not want

to do so. This does not necessarily demonstrate duress. There may have been alternatives. Plaintiff perhaps could have sought other timber sources or it could have stood its ground and sued for breach in 1974 instead of in 1979. *See Murphy v. United States*, 209 Ct.Cl. 352 (1976) (plaintiff held not to have resigned his position under duress where threatened with an investigation he could have contested). We do not intimate that suit would be a reasonable alternative in every case. However, by signing the modification without protest at the time, defendant argues that plaintiff waived its rights and by accord and satisfaction made a considered business judgment that it would rather proceed under a modified contract than to sue for breach. Plaintiff appears to want it both ways—the benefits of the modified contract and damages for breach as well. If plaintiff is correct in its approach to this problem, it is hard to imagine how a contract modification could ever stand where it was accepted with reluctance. Years afterward, as here, a party could come in claiming duress and great uncertainty would thus attend contract law. We have no doubt but that plaintiff did not like the modified contract to which the Forest Service asked it to agree, but agree it did. The issue, therefore, becomes one of whether the agreement was illegally induced by duress. The duress relied upon by plaintiff here is economic duress. It needed to get timber. It thought timber would be hard to get elsewhere. Maybe it would be more expensive elsewhere. However, economic pressure is not duress if there are reasonable alternatives to agreeing to a modification of the contract. *David Nassif Associates v. United States*, 226 Ct.Cl. ——, 644 F.2d 4 (1981). The point may be illustrated by the following language from our recent decision in *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 321–23, 531 F.2d 1037, 1042–43 (1976). There the court said:

> Economic pressure and "even the threat of considerable financial loss" are not duress. *International Tel. & Tel. Corp. v. United States*, 206 Ct.Cl. 37, 52, n. 11, 509 F.2d 541, 549, n. 11 (1975).

"Economic duress may not be implied merely from the making of a hard bargain." *Aircraft Associates & Mfg. Co., Inc. v. United States*, 174 Ct.Cl. 886, 896, 357 F.2d 373, 378 (1966). The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions. *Fruhauf Southwest Garment Co. v. United States, supra*, 126 Ct.Cl. at 62, 111 F.Supp. at 951. "Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity." *LaCrosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 177, 432 F.2d 1377, 1382 (1970).

\* \* \* \* \* \*

\* \* \* Their failure to raise a claim of duress soon after fear of its consequences had been removed is compelling evidence that there was no duress in fact. *Silliman v. United States*, 101 U.S. 465 [25 L.Ed. 987] (1879); *Loral Corp. v. United States*, 193 Ct.Cl. 473, 482, 434 F.2d 1328, 1332 (1970); *John Arborio, Inc. v. United States*, 110 Ct.Cl. 432, 76 F.Supp. 113 (1948).

The court's opinion in *Johnson, Drake & Piper*, 209 Ct.Cl. at 324, 531 F.2d at 1044, distinguishes an earlier case which is inapposite on its facts, *Urban Plumbing & Heating Co. v. United States*, 187 Ct.Cl. 15, 408 F.2d 382 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970).

Although plaintiff's claim of duress under the information we now have before us is highly suspect, we will not jump to any conclusion that it did or did not exist. There are too many unanswered questions of fact. For instance: How much timber was accessible to plaintiff? What was its relation to plaintiff's mill capacity? At what rate did plaintiff's mill or mills run to capacity? How did the modification impact on plaintiff's business? What was the proportion of this particular timber to plaintiff's total needs and supply? How dependent was plaintiff on government timber? How scarce is scarce? What was plaintiff's knowledge of these matters and by what

evidence? What was defendant's knowledge? Did defendant act in good faith? Were plaintiff's alternatives to the modification viable? If there was a scarcity of timber, was it defendant's fault?

The parties have given us affidavits that bear on the answers to some of these questions but the affidavits disagree on the facts and raise questions of credibility we cannot resolve with any confidence on these motions.

Answers to the foregoing, and other pertinent questions that could be asked, need to be aired. This case is simply not ripe for summary judgment now. Each duress case must be decided on its own facts, generally requiring trial because the alleged facts are disputed and must be tested. That is true here. We need findings before we can make dispositive legal conclusions in this case.

■ There are two issues in the case, however, which we can and will put to rest now. First, it is defendant's position that it cannot be held to have breached the contract, the issue of duress aside, because to have continued with the original contract would have frustrated its purpose. Under this theory, as previously explained, defendant says the Forest Service has long been required, by laws enacted in 1891, 1897, 1960, and 1976,[1] to conserve the national forests and that if the original contract had been carried out pursuant to its terms there would have been extensive damages to the soil, watershed, and forest, due to the cutting of so much timber, the building of roads, soil erosion, and other environmental losses. Thus, the purpose of the contract would have been frustrated. It follows, from defendant's point of view, that every such contract has an implied condition that defendant may be absolved from performance and the contract may be rewritten when it comes to the conclusion that the contract terms should be amended because

of discovery of these environmental considerations or changing public concepts of aesthetics and the environment which bring pressure to bear.

This is a specious argument. The Government owned the land and presumably knew the conditions before it contracted. If it did not know, it reasonably should have known. It surveyed the area and drew up the specifications for bids. There was no provision for cancellation for environmental reasons either in the contract or in Forest Service regulations. On the contrary, section 2433.23 of the Forest Service Manual provides:

> The Forest Service has no legal right to make unilateral modifications, even to prevent potential environmental or resource damage. If agreement on a proposed modification cannot ·be reached with the purchaser, a choice must be made among living with the contract as it is, finding an acceptable modification alternative, or cancellation of the contract.

A letter from the Forest Supervisor to plaintiff, dated November 7, 1973, called attention to the above language. Environmental problems were anticipated. Such risk was borne by the defendant when it went ahead with the contract. It knew that any unilateral termination or cancellation would be a breach. Defendant took a calculated risk because it had a good commercial purpose in doing so, just as plaintiff may have had in agreeing to the modification. Defendant's purpose was the profitable sale of timber at rates fixed by it.

We need not belabor the point. The belated defense of frustration fails on the authority of *Everett Plywood Corp. v. United States*, Ct.Cl., 651 F.2d 723 (1981), where the subject is fully dealt with by the court. We need not repeat that discussion.

The other issue we will resolve now is plaintiff's argument that even in the absence of duress the Red Rock timber sale

1. Act of March 3, 1891, 26 Stat. 1103, codified at 16 U.S.C. § 471 (1976) (repealed by Pub.L. No. 94–579, 90 Stat. 2792 (1976)); Act of June 4, 1897, 30 Stat. 35, codified at 16 U.S.C. § 476 (1976) (repealed by Pub.L. No. 94–588, 90 Stat. 2958 (1976)); Act of June 12, 1960, 74 Stat. 215, 16 U.S.C. §§ 528–531 (1976); Act of October 22, 1976, 90 Stat. 2958, 16 U.S.C. §§ 472a, 1600–1614 (1976).

contract should be deemed unenforceable on the basis of unconscionability. Plaintiff relies on section 2–302(1) of the Uniform Commercial Code, which provides:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause so as to avoid any unconscionable result.

Our attention has not been directed to any case, and we know of none, where this doctrine has been applied when, as here, the action was not unilateral but, on the contrary, both parties agreed to the contract modifications. The doctrine has been applied in situations where one party signed an unreasonable contract with little or no knowledge of its terms, from which it could be inferred there was no consent. *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C.Cir.1965). That clearly is not the situation here. Plaintiff is one of America's largest corporations, skilled and knowledgeable in the timber business. Its own bargaining power is considerable. It knows government contracting. It knew what it was doing but just did not like it. Plaintiff thought it was entitled to a better, fairer deal, but this does not make the modification unconscionable or render the contract impossible or even unprofitable to perform. Plaintiff completed work on this project on November 2, 1978. We reject plaintiff's argument that the agreement of the parties should be unenforceable because it was unconscionable.

Both pending motions for summary judgment are denied. The case is remanded to the trial division for proceedings consistent with the views expressed in this opinion.