**DREXEL HERITAGE FURNISHINGS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Ethan Allen, Inc., Intervenor.**

**No. 661–83C.**

United States Claims Court.

Dec. 20, 1983.

Richard C. Johnson, Washington, D.C., for plaintiff.

Eileen Fennessy, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

Robert H. Koehler, Washington, D.C., for intervenor.

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TIDWELL, Judge:

This case comes again before the court,[1] this time on Defendant's Motion for Summary Judgment filed on November 8, 1983, Plaintiff's Opposition thereto filed on December 1, 1983, and Intervenor's Memorandum of Points and Authorities filed on November 28, 1983. Briefing was completed on December 8, 1983. After a careful review of the record before the court and for the reasons stated below, Defendant's Motion for Summary Judgment is denied.

## FACTS AND PROCEDURE

Plaintiff, on November 2, 1983, filed its initial complaint seeking declaratory and injunctive relief, and simultaneously filed motions for a preliminary injunction and a temporary restraining order to prevent defendant from making an award under General Services Administration's (GSA) Request for Proposals No. FNPS–S7–1491–N–5–4–83 (the solicitation) pending a decision from the General Accounting Office (GAO) on plaintiff's bid protests.[2] On November 7, 1983 plaintiff filed its First Amended Complaint which added, in effect, a request that the court delay award of the contract until resolution of plaintiff's challenge to intervenor's compliance with the Walsh-Healy Act, 41 U.S.C. 35–45. Defendant thereafter filed its Motion for Summary Judgment and Opposition to Plaintiff's Request for Injunctive Relief, and Ethan Allen, Inc., intervenor herein, filed a motion to intervene. Intervenor's motion was granted on November 8, 1983 at the hearing on Plaintiff's Temporary Restraining Order as a matter of right pursuant to RUSCC 24(a). All parties subsequently filed motions for expedited discovery and sought protective orders.

---

1. Plaintiffs initial request for injunctive relief was denied by this court on November 10, 1983. The original jurisdiction of this court to hear the case was discussed at length in the November 10, 1982 order, and there is no need to repeat it here.

2. At the time of the hearing on Plaintiff's Motion for a Temporary Restraining Order held November 8, 1983, plaintiff had filed a total of three related bid protests with GAO.

On November 10, 1983, the court denied Plaintiff's Motion for a Temporary Restraining Order and on November 14, 1983 issued a call to GAO pursuant to RUSCC 34(d) requesting that GAO file an advisory decision with the court by December 31, 1983.[3] Meanwhile, on November 14, 1983, defendant awarded a contract under the solicitation to intervenor, Ethan Allen, Inc.

Thereafter, at a status conference held on November 18, 1983, plaintiff withdrew its request for preliminary injunction and the court suspended all discovery pending a ruling on Defendant's Motion for Summary Judgment.[4]

This action comes about because of a dispute between plaintiff and GSA over the handling of a negotiated procurement. On March 21, 1983, GSA issued the solicitation which requested proposals for a one-year indefinite quantity requirements contract, with two one-year options, to provide packaged homes of household furniture and furnishings for overseas use by officers and personnel of the United States, principally those of the Department of State. The Department of State had awarded, pursuant to a delegation of authority from GSA, four similar, if not identical, contracts to plaintiff to satisfy its requirements for overseas household furnishings covering the past 13 years. GSA terminated the delegation of authority to the Department of State after fiscal year 1983 and proceeded to conduct the procurement for fiscal year 1984, as evidenced by the issuance of the solicitation.

The solicitation, contained the following pertinent provisions:

Section C entitled "SOLICITATION INSTRUCTIONS AND CONDITIONS AND NOTICES TO OFFERORS", provided as follows:

**3.** On December 14, 1983, GAO issued advisory decision, B–213169, denying plaintiff's bid protests.

**4.** At the November 18, 1983 conference, plaintiff informed the court that it would be unnecessary to engage in discovery in order to respond to Defendant's Motion for Summary Judgment.

2. *Style and Design of Furniture*

    A. Background: The Government has, in the past contract, purchased homes of Italian Provincial/Transitional (Drexel Cameo), *18th Century English Design* (Drexel 18th Century Classics) and Contemporary (Drexel Accolade II). *For continuity, the Government will continue to purchase these three designs.* Offerors may propose any or all of these 3 styles, but proposals must be for a complete home package.[5] (Emphasis added.)

7. *Special Conditions*

    C. *Availability of Furniture for Inspection.*

      \*    \*    \*    \*    \*    \*

    1. Furniture offered must be *regular commercial lines* of residential furniture. Representative pieces from the line(s) offered should be available in commercial outlets for informal inspection. . . . The offeror should list at least three major commercial outlets where the line(s) offered are regularly sold and are on display. . . . (Emphasis added.)

      \*    \*    \*    \*    \*    \*

Section D entitled, "EVALUATION FACTORS FOR AWARD," contained the following relevant provisions:

      \*    \*    \*    \*    \*    \*

2. *Evaluation*

    A. *Acceptability*

    Furniture proposed must meet all *specifications and requirements* in Section F. The proposal must address all the requirements of the RFP. A complete home package must be proposed. If these requirements cannot be met,

**5.** The only other mention in the solicitation of the design at issue here appears in section D, 2–F "Pricing" which refers to the design simply as "18th Century"; and section E, 2–C which also refers to the design as "18th century".

no further consideration will be given. (Emphasis in original RFP.)

Section F, entitled "DESCRIPTION/SPECIFICATIONS", sets forth the specifications for the furniture to be provided under a resulting contract. The following are pertinent provisions:

1. *General*

This Section F covers the minimum general requirements for wood and upholstered furniture items, and accessory items, which is of a quality required by the Department of State for use in Federal installations such as homes and quarters provided certain overseas personnel of the U.S. Government.

2. *Furniture, Household, Wood and Upholstered*

A. Furniture offered must be comparable in overall quality of construction, materials, and workmanship to Drexel Heritage Cameo/Francesca, 18th Century Classics, and Accolade II lines. Attachment C of this RFP sets forth quality standards of Drexel Heritage furniture to guide offerors as to the quality levels required....

The attachment C referenced in the specifications, entitled "QUALITY STANDARDS OF DREXEL HERITAGE FURNITURE", included the following information:

NOTE TO OFFERORS: (SEE ALSO SECTION C OF RFP)

This Attachment C lists the *quality* standards employed by Drexel in producing Heritage Furniture lines that yield the minimum requirements of the Department of State. The Department will accept furniture produced under other standards that achieve a comparable level of quality in construction, materials, and workmanship.

\*   \*   \*   \*   \*   \*

Section C of this Attachment states *design* characteristics of the Drexel Heritage lines. As the note to Section C indicates, these characteristics are provided

for informational purposes only. (Emphasis added.)

Section C of attachment C provides:

The following are particular design characteristics of Drexel: Accolade II, 18th Century Classics, and Heritage Cameo style lines. These are not to be considered design specifications; they are provided for informational purposes only.

A pre-bid conference to discuss the solicitation was held on April 6, 1983 with all potential offerors and representatives of the Department of State in attendance. Representatives of GSA conducted the conference and several issues were addressed including whether the styles and designs specified in the solicitation were mandatory and whether furniture offered had to be from a manufacturer's "regular commercial line." Plaintiff alleges that GSA officials represented that the Department of State, as the user, had specified the three styles they wanted and that GSA would defer to their wishes. Furthermore, plaintiff alleges that "Mr. Burns (of GSA) stated that the commerciality requirement would be strictly enforced."

On April 20, 1983, Ms. Gaumer, the GSA Contracting Officer, and Ms. McQueen of the Department of State visited the showroom of Marvin J. Perry & Associates, plaintiff's representative. Plaintiff alleges, based on Mr. Perry's affidavits, that Mr. Perry expressed concern that GSA might consider cherry furniture to be 18th century English furniture. Mr. Perry states that, "Ms. Gaumer brought up the possibility of bidding cherry but stated that the State Department would be the authority that would decide what would be acceptable." Plaintiff also alleges that "during the course of the viewing, Ms. McQueen emphatically stated that cherry furniture would not be acceptable to satisfy the 18th century English requirement because cherry was an 18th century Early American design not an 18th century English design." Mr. Perry avers that "Ms. McQueen specifically stated to [him] that if Drexel proposed cherry furniture in response to the 18th century English requirement Drexel's

proposal would be rejected." Plaintiff contends that it was not until September 7, 1983 that it had even an informal indication that GSA would consider cherry as an acceptable substitute for the 18th century English requirements of the specifications. Defendant disagrees and counters by saying that plaintiff knew at the latest by early August, if not by mid-April 1983, that GSA would consider cherry as an acceptable substitute under the 18th century specifications.

Specifically, defendant alleges that paragraph No. 18 of Amendment No. 1, issued April 18, 1983, two days before Mr. Perry's meeting with Ms. Gaumer and Ms. McQueen put plaintiff on notice that types of woods and styles other than 18th century English (made from mahogany) would be acceptable to defendant. Paragraph 18 of Amendment No. 1 reads:

> The furniture designs and styles referenced in this solicitation are not intended to provide a detailed description of acceptable items for this contract. All reasonable responses shall be evaluated and be subject to rejection or acceptance of the proposed item. Designs and styles referenced herein are given as guidelines only to aid in establishing a base line for the type of furniture solicited.[6]

During May and June, 1983, Amendments Nos. 2 through 5 to the solicitation were issued. Amendment No. 5 extended the date for submission of offers to June 13, 1983. Thereafter, several offers were received, including plaintiff's, and the Source Evaluation Board (SEB)[7] met on several occasions to evaluate the offers. The SEB, based on a review of the literature and photographs submitted, found all offers to contain deficiencies except plaintiff's and from late July through August it conducted negotiations with all offerors other than plaintiff to identify the deficiencies and discuss possible solutions. Some solutions involved modifications to commercial items to bring them into compliance with the solicitation.[8]

During August all offerors other than plaintiff were given an opportunity to revise their proposals.[9] Upon receipt and evaluation of the revised proposals GSA determined that all proposals were technically acceptable and within the competitive range, and all offerors were so advised by letter on August 23, 1983. During the following weeks bid samples were submitted to GSA and several offerors, including plaintiff, were requested to make modifications to their submittals based on an inspection of the samples.

Meanwhile, a flurry of correspondence ensued between plaintiff, GSA and the Department of State wherein plaintiff questioned the handling of the solicitation and made allegations that GSA had relaxed the specifications and had not timely notified plaintiff.[10]

On September 15, 1983, a meeting was held between GSA officials and plaintiff's representatives to discuss plaintiff's concerns. Among the issues discussed, the court surmises from the record before it, were the use of cherry for the 18th century line and the commerciality requirement set forth in the solicitation. It is clear from the record that the parties disagreed on

---

6. As is evident by now, neither the solicitation nor the amendment are models of clarity and leave ample room for the type of disagreement present in this case.

7. The SEB was composed of five members, three representatives from GSA and two representatives from the Department of State.

8. Plaintiff also raised the issue of whether the modifications were minor in nature or whether they were major enough to constitute a substantial change in the solicitation which would require resolicitation. On November 9, 1983 the court received for *in camera* inspection a list of all such modifications but, in light of the current posture of the case, we reserve judgment on the issue for a later time.

9. Plaintiff was not included in this process because its original proposal had been determined to be acceptable, hence, no revisions were necessary.

10. At this point in time the two Department of State representatives were withdrawn from the SEB because the Department was convinced that its views were being ignored by GSA.

several significant matters, all of which precipitated the meeting. It is equally clear that the meeting did not resolve those disagreements.

On October 7, 1983, GSA notified all offerors that best and final offers were due October 21, 1983. Meanwhile, on October 5, 1983, GSA had issued Amendment No. 6 to the solicitation which provided in pertinent part: "The Government will consider modifications to regular commercial lines needed to meet the technical requirements listed herein." The Amendment also expressed defendant's interpretation of "regular commercial line" by setting forth the definition found in the Federal Procurement Regulations § 1–3.807–1(b) (Amendment 194, Sept. 1978):

> Regular commercial lines of all household furniture include all household-type furniture lines of a kind or class which (1) are regularly used for other than Government purposes and (2) are sold in the course of conducting normal business operations.

Upon receipt of Amendment No. 6, plaintiff requested a 30-day time extension for submitting best and final offers in order to revise its offer in light of what it perceived as changes to the solicitation contained therein. GSA denied plaintiff's request by letter of October 19, 1983, reasoning that Amendment No. 6 merely reiterated information that had been known to plaintiff for some time.

By November 3, 1983 defendant had completed its evaluation of all offers and had made the necessary determination to award the contract notwithstanding the pending GAO protest. Defendant, however, agreed to delay award until November 14, 1983 because of the proceedings before this court.

## DISCUSSION

The court is now ready to address the issues raised by Defendant's Motion for Summary Judgment and the parties' briefs. Initially, it must be said that this action is properly before the court. In *F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476 at 1479–1480 (Fed.Cir.1983), the Court of Appeals for the Federal Circuit held that the United States Claims Court retains jurisdiction under 28 U.S.C. 1491(a)(3) (1982), in a pre-award contract case, to grant equitable relief after an award of the contract has been made so long as the action was filed and jurisdiction was proper prior to the award. The court so holds in this case. *See Drexel Heritage Furnishings, Inc. v. United States,* 3 Cl.Ct. 718 at 722 (1983) (Denial of Temporary Restraining Order).

The initial inquiry to be made by the court in addressing Defendant's Motion for Summary Judgment, is to determine whether summary judgment is appropriate. To grant defendant's motion, the court must find that there is no genuine issue as to any material fact. *Johnson Controls, Inc. v. United States,* 1 Cl.Ct. 256 (1982). Moreover, any doubts about the existence of a genuine issue of material fact will be resolved against the moving party, *Housing Corporation of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972), and when the materials presented to the court present a choice of inferences to be drawn from the underlying facts, the inferences must be viewed in the light most favorable to the non-moving party. *South Louisiana Grain Services, Inc. v. United States,* 1 Cl.Ct. 281, 289 (1982).

At this point it should be noted that the burden on the non-moving party, plaintiff in this case, to show the existence of a genuine dispute about a material fact is not a stringent one. *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). A reasonable showing on plaintiff's part, supported by affidavits which contradict the material factual contentions proffered by the moving party, is sufficient. Where, as in the present case, the record before the court is contradictory, confusing, and raises issues of credibility which require further factual inquiry so as to render summary judgment impossible, then plaintiff has met its burden. *See, e.g., Louisiana-Pacific Corpora-*

*tion v. United States,* 228 Ct.Cl. 363, 369; 656 F.2d 650, 654 (1981).

■■■ As aptly pointed out in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, "Summary judgment should never be used merely to cut short a trial where factual issues should be explored." *See also* 6 Moore's Federal Practice ¶ 56.02[1] at pp. 56–23, 56–24 (1983). Moreover, the court agrees with Judge Goldberg's admonition in *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 612 (5th Cir. 1967), that "summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Id.* We have reviewed the materials before us and have concluded that plaintiff must be allowed its day in court. Defendant and intervenor must prove their case at trial.

As pointed out previously, plaintiff alleges, with supporting affidavits, that it was not aware that cherry was an acceptable wood for the 18th century English design until September 7, 1983. Indeed, it even appears unclear from the record whether GSA had strayed from its initial requirement for 18th century English to any other 18th century design. Plaintiff claims to rely upon alleged statements by GSA personnel as support for its position. Defendant and intervenor counter, also with supporting affidavits and documents, including a letter signed by Mr. Perry on August 24, 1983, that plaintiff knew at least by early August, and possibly as early as April of 1983, that cherry was acceptable for the 18th century design.

Plaintiff also alleges, with supporting affidavits and documents, that defendant relaxed the commerciality requirement in the solicitation over the course of the procurement and failed to timely notify plaintiff in violation of applicable regulations.[11] Plaintiff claims that, in light of the alleged untimely issuance of Amendment No. 6 to the solicitation, the subsequent denial of plaintiff's request for an extension of time to submit its best and final offer was arbitrary

and capricious and an abuse of discretion on the part of GSA. As can be expected, defendant and intervenor, supported by affidavits and documents, deny that GSA relaxed the commerciality requirements of the solicitation and allege that Amendment No. 6 was timely issued and merely constitutes a clarification and a restatement of what all offerors including plaintiff already knew.

The court faces a situation similar to that in *Louisiana-Pacific,* 228 Ct.Cl. at 369, 656 F.2d at 654, in that "the parties have given us affidavits that purport to address the issues before the court but the affidavits disagree on the facts and raise questions of credibility which cannot be resolved with any confidence on these motions." While it is true that not all allegations of disputed facts are material to the ultimate resolution of the issues on the merits, it is clear to the court that further findings are needed before making dispositive legal conclusions in this case. *See Louisiana-Pacific,* 228 Ct.Cl. 369, 656 F.2d at 654.

Thus, based on the submissions of the parties, the court finds that there are genuine issues of fact relating to the interpretation of the solicitation and the conduct of the parties in relation thereto. Moreover, the court must decide whether GSA acted in violation of applicable regulations and thereby damaged plaintiff. It is not clear to the court, due partly to the contradictory nature of the affidavits which themselves raise issues of credibility, and due partly to the fact that the parties have failed to join issues, whether plaintiff was treated equally with other offerors by GSA, and whether GSA's actions were arbitrary and capricious and constitute an abuse of discretion. As further evidence that there are factual issues yet to be resolved, the court need look only to Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Request for Injunctive Relief. Defendant characterized the primary issue in the case as a factual one rather than a legal one, to wit: "Whether GSA relaxed the specifications without notifying plaintiff."

---

11. 41 C.F.R. § 1–3.805–1(d).

Suffice it to say that there are factual issues, or at least mixed issues of fact and law, which make this case unsuitable for disposition on Defendant's Motion for Summary Judgment. Such issues must be resolved and the true facts determined at trial.

## CONCLUSION

It is therefore ordered that Defendant's Motion for Summary Judgment is denied and the parties are directed to prepare for a trial on the merits.

IT IS SO ORDERED.