SQUIRREL CREEK ASSOCIATES and North Cranbrook Associates, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 155–85C.

United States Claims Court.

Dec. 17, 1986.

Daniel M. Share, Detroit, Mich., for plaintiffs; Barris, Sott, Denn & Driker, Detroit, Mich., of counsel.

Hillary A. Stern, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant; Joseph T. Casey, Jr., and Melvin Belin, of counsel.

## OPINION

MAYER, Judge.

Plaintiffs Squirrel Creek Associates and North Cranbrook Associates claim defendant breached contractual duties attending a commitment to insure a mortgage for a proposed federally sponsored housing project. The case is before the court on defendant's motion for summary judgment.

### Background

In December of 1979, the Department of Housing and Urban Development (HUD) issued a Notice of Fund Availability which invited proposals under the Section 8 Hous-

ing Assistance Payments program, derived from section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, to provide housing assistance for low and moderate income tenants. Section 8 funds subsidize housing projects by paying sponsors the difference between the reduced rent paid by low income tenants and the fair market rent for equivalent housing in the area. Plaintiffs submitted a proposal in response to the Notice of Fund Availability to build 136 units of low and moderate income housing, the Squirrel Creek project, in Pontiac Township, Michigan. Although HUD found the proposal acceptable, it was assigned a lower priority than some other projects, and funds under the Notice were exhausted before plaintiffs' proposal could be funded.

In mid–1980, additional Section 8 funds became available for proposals which could achieve a construction start by September 30, the last day of the fiscal year. A construction start is considered achieved when an Agreement to Enter into a Housing Assistance Payment (AHAP) is executed. HUD's issuance of a firm commitment to insure the mortgage on the project is a prerequisite to an AHAP. See National Housing Act § 221(d)(4), 12 U.S.C. § 1715l(d)(4). Both occur before the initial closing of the project, which generally takes place before the start of construction.

Plaintiffs submitted an application for a firm commitment that would have resulted in a construction start by September 30, 1980, for the Squirrel Creek project. Later in the summer of 1980, John Terranella, the Director of Housing for HUD's Detroit Field Office, met with two of plaintiffs' partners, Leo Sklar and Manny Ravet, and their attorney. Terranella disclosed that plaintiffs' proposal received a relatively low ranking because of the saturation of one-bedroom family units in the Pontiac market

area. As a result of this meeting, the parties agreed that plaintiffs would submit a firm commitment application based on the original proposal, and that HUD would process the application, issue the firm commitment, and execute an AHAP.

The parties agreed, however, that while HUD was processing the application plaintiffs would redesign the project and prepare an application for an amended firm commitment for a new project, consisting of a 48 unit apartment complex for the elderly and 88 family townhouse units. Terranella agreed that HUD would process the revised application "as quickly as possible," which plaintiffs took to mean within two weeks of submission, so as not to prejudice their ability to obtain financing for the project. According to Terranella, the application for an amended firm commitment was to have been submitted by October 15, 1980. Plaintiffs say there is "no possible way" they would have consented to so early a submission because they would not have had adequate time to revise the application.* They contend that on November 7, 1980, the amended application was submitted to HUD; defendant says it did not receive the application until November 13. The application was deficient and had to be revised. Although plaintiffs did not receive formal letter notification of the deficiencies until December 12, 1980, HUD officials were working with plaintiffs to correct the deficiencies before then. On December 17 the deficiencies were corrected, and HUD issued an amended firm commitment to plaintiffs for the Squirrel Creek project on January 9, 1981.

Interest rates had increased substantially in the latter part of 1980 and by January of 1981 had gone so high that plaintiffs, in common with many other developers, could not obtain the financing necessary to close on their project. In recognition of the developers' plight, for part of 1981 and 1982

---

* Plaintiffs contend the meeting took place in late August or mid-September of 1980. Defendant responds it was earlier but that the date is immaterial because plaintiffs agreed to submit the amended firm commitment by October 15, 1980. Plaintiffs reply that the date is indeed material because, since it normally takes 60 days to obtain variances and approval of the site plan, they would not have agreed in August or September to a date as early as October 15. For reasons developed below, the conflict need not be resolved.

HUD followed a national policy of extending firm commitments beyond the stated 60 day effective period. Plaintiffs were given extensions for over fifteen months, covering the period when the national policy was in effect, as well as before and after it was followed when requests for renewal were carefully reviewed for their continued viability. But they remained unable to close on the project.

On June 8, 1982, HUD informed plaintiffs that it would grant no further extensions to the January 9, 1981, firm commitment and it was not renewed. This was when they first learned that the extension they had received in March of 1982 was the last one. In a June 17, 1982, letter, HUD was told that plaintiffs had obtained financing which would allow them to close on the Squirrel Creek project. HUD responded that it did not renew the firm commitment because "the general area of the proposed project has a huge surplus of rental housing with vacancy rates approaching the 20% range;" a "number of Secretary Held mortgages in close proximity to [the Squirrel Creek] location [are] experiencing great financial difficulty because of existing market conditions;" and the "development of a new Section 8 project in the area would undermine our current workout negotiations with the mortgagors and adversely affect an already troubled rental market."

Plaintiffs appealed this decision of the Detroit field office to the General Deputy Assistant Secretary of HUD-Deputy Federal Housing Commissioner, who later became an assistant secretary. They supplied a report of Larry Wilkinson, an independent housing market analyst, which contradicted the findings of the Detroit office. Wilkinson concluded the market conditions in the Pontiac Township area would not be adversely affected by the Squirrel Creek project and there was substantial household need and market strength to support it. After reviewing the situation three times, the Deputy Assistant Secretary affirmed the decision of the Detroit office, observing that the Wilkinson report was "somewhat limited in scope." Among other differences, the report defined the Pontiac market area for Squirrel Creek more restrictively than it was defined in the department's internal records.

On September 30, 1982, HUD approved a Michigan State Housing Development Authority elderly housing development, known as Phoenix Place. Unlike Squirrel Creek, this project was in downtown Pontiac. It was not a federally insured project, but was granted Section 8 subsidies.

Plaintiffs brought suit here and make three major allegations. First, they contend defendant breached the September 30, 1980, firm commitment by requiring plaintiffs to redesign the project. Next they claim defendant failed to process the revised proposal and amended firm commitment as expeditiously as agreed, causing them to miss out on favorable financing which prevented them from building. Finally, plaintiffs allege that defendant breached the January 9, 1981, amended firm commitment by wrongfully terminating it, and that the termination was in bad faith. The court will address these arguments in turn.

## Discussion

### I

The first contention, that HUD breached the original firm commitment by requiring plaintiffs "to completely redesign the project," is answered by their concession on brief that "the September 30, 1980 commitment, a writing which normally was a binding contract conferring rights on a project sponsor, was a nullity, except for statistical purposes." A null agreement cannot be breached. *Schoenbrod v. United States,* 410 F.2d 400, 404 (Ct.Cl.1969). At oral argument plaintiffs recognized this and abandoned this count.

### II

The next claim is premised on the theory that HUD breached an "express and/or implied-in-fact agreement" because it failed to process the revised proposal or issue the amended firm commitment "as expeditiously as possible." Plaintiffs allege that the approval process could have been complet-

ed in two weeks and that had HUD done so as agreed, they would have obtained the financing necessary to close on this project. Because HUD failed to expedite the process, by the time the revised application was approved and an amended firm commitment issued, interest rates had "sky-rocketed" and plaintiffs were unable to obtain financing.

The September 30, 1980, contract contains no terms governing the time in which a revised proposal must be processed and is inoperative in any event, as plaintiffs concede. But they say defendant agreed to do it within two weeks. There was either a verbal contract or a contract implied from the parties' conduct. Defendant denies and there is nothing in the record that there was agreement to act in two weeks, although defendant admits it could have been done that quickly. For this motion, the court assumes that "as expeditiously as possible" meant within two weeks.

■ Plaintiffs say they signed and submitted the revised application on November 7, 1980, but defendant did not receive it until November 13. From either date, however, two weeks of processing would have taken the parties well beyond the middle of November. The record shows only that financing would have been available to plaintiffs in "mid-November, 1980 ... had HUD issued an amended firm commitment and final approval of the bond issue." So plaintiffs would have been unable to meet this deadline regardless which date should have triggered processing. If there was a two week agreement, defendant's adherence to it would not have helped plaintiffs.

In point of fact, however, when it was submitted in November the application contained significant deficiencies. Even in early December, three or four weeks after the documents were submitted, depending on which party's date is accepted, HUD was still working with plaintiffs to cure them. Finally, on December 12 it gave formal notice of the deficiencies still existing and said that if they were not corrected within five days the application would be returned. By December 17, plaintiffs had

corrected the deficiencies and on January 9, 1981, HUD issued the amended firm commitment. This was roughly two work weeks when the Christmas and New Year holiday period is factored out. Under this scenario, defendant did follow the alleged agreement, but because of plaintiffs' delinquency it was too late.

The evidence also shows that plaintiffs agreed to submit the documents by mid-October 1980. Terranella said they promised them by October 15 and testimony by Ravet and Sklar, representatives of plaintiffs, supports him. Sklar said plaintiffs expected to "close" on the project sometime in mid-October to early November. The amended firm commitment was a prerequisite to closing, which would require that the documents be submitted at least two weeks before the closing date. Ravet said plaintiffs expected to break ground by early November and, again, the application would have had to be in several weeks before then to assure meeting the ground breaking schedule. Therefore, plaintiffs submitted their documents at least three weeks late and caused their own problems.

■ If there was no express agreement, plaintiffs contend there was an implied agreement that defendant would process the documents expeditiously. In a contract implied-in-fact, there must be

> the same mutual intent to contract, as well as the absence of any ambiguity in the offer and acceptance, as is required for an express contract. Plaintiff must show an agreement based upon a meeting of the minds that can be inferred, as a fact, from the conduct of the parties under existing circumstances which manifests their tacit understanding. A definite offer by one party and an unconditional acceptance by the other must be established....

*Prevado Village Partnership v. United States,* 3 Cl.Ct. 219, 223 (1983) (citations omitted). The parties' disagreement about the date on which plaintiffs were to submit the revised proposal and how expeditiously defendant was to process the documents

shows there was no "meeting of the minds" and, therefore, no contract.

In the absence of an express or implied contract, plaintiffs' claim would have to fit into one of the two noncontractual causes of action over which this court has jurisdiction under the Tucker Act. "The first is for money illegally exacted, as for example, tax refund claims. The other is when the claimant shows that some specific provision of law commands expressly or by implication the payment of money upon proof of conditions he is said to meet, *e.g.*, fifth amendment taking claims or claims by illegally discharged government employees for back pay." *City of Alexandria v. United States*, 737 F.2d 1022, 1028 (Fed.Cir.1984). A claim like ours "for loss of a favorable bargain caused by excessive delay" does not fall within the ambit of either of these two noncontractual theories. Therefore, it is not covered by the Tucker Act, *id.; Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1009, 178 Ct.Cl. 599 (1967), and the court cannot hear it.

## III

The wrongful termination of the January 9, 1981, amended firm commitment and bad faith arguments are premised on the parties' undoubted obligations to fairly deal with one another and act in good faith in the performance of a contract. *See Louisiana-Pacific Corp. v. United States*, 656 F.2d 650, 652, 228 Ct.Cl. 363 (1981); Restatement (Second) of Contracts § 205 (1979). The principles of general contract law apply to government contracts, of course, so "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Torncello v. United States*, 681 F.2d 756, 762, 231 Ct.Cl. 20 (1982), quoting *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). And, a "party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Pacific Far East Line, Inc.*

*v. United States*, 394 F.2d 990, 998, 184 Ct.Cl. 169 (1968). According to plaintiffs *Everett Plywood Corp. v. United States*, 512 F.2d 1082, 206 Ct.Cl. 244 (1975), controls the application of these principles to our case.

In *Everett Plywood*, it was the well-established practice or custom of defendant to liberally grant extensions of time to perform the terms of contracts to cut timber. When the contract was signed, the parties there "contemplated" that extensions would be granted, regulations codified this practice, and until plaintiff's request for an extension was denied, none had ever been refused. 512 F.2d at 1086. Indeed, for more than eight years, plaintiff had been given extensions. In concluding defendant had breached the contract, the court said, "[W]here a well-established practice or custom is shown to exist, it is assumed that the parties to a contract intended that practice or custom to apply, in the absence of express language in the contract to the contrary." *Id.* at 1089. The court also thought it significant that the regulations recognized the practice of generously extending the time for performance. *Id.*

Our case is different. Although HUD granted extensions for more than fifteen months, to fall within the purview of *Everett Plywood*, plaintiffs must show there was a "well-established practice or custom" of extending commitments when they entered into the contract. There is no evidence that an automatic extension policy existed at that time. Indeed, the applicable regulation said that a "firm commitment ... shall be effective for a period of not more than 60 days from the date of issuance." 24 C.F.R. § 221.509(b)(3)(i). A clause in the firm commitment echoed the regulation: the "commitment shall terminate 60 days from the date hereof unless renewed or extended by the [Federal Housing] Commissioner." This militates against the argument that HUD had a practice or custom of granting extensions.

After plaintiffs received their commitment, and at the height of the interest rate

spiral, a national policy was followed to readily extend certain commitments, of which plaintiffs' apparently was one. But once this economic problem abated, review of commitments reverted to the earlier practice of particularized scrutiny. The record shows that HUD decided that Squirrel Creek's firm commitment should not be renewed after it determined that the proposed project had significant problems in light of the then existing conditions of the housing market. This is in contrast to *Everett Plywood* where defendant "impose[d], unilaterally, an additional condition on further extensions merely on the basis of speculation ...," when its practice was to grant extensions unless it would be "disadvantageous to the United States." 512 F.2d at 1090. Therefore, plaintiffs' reliance on that case is misplaced and the termination of their commitment was within defendant's rights.

▪ In response to plaintiffs' bad faith argument, defendant correctly observes that good faith conduct by government officials is presumed unless bad faith is shown. *Torncello v. United States*, 681 F.2d at 771.

> [I]t requires "well-nigh irrefragable proof" to induce the court to abandon the presumption of good faith dealing. *Knotts v. United States*, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954).

In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some *specific intent to injure the plaintiff*. Thus, in *Gadsden v. United States*, 78 F.Supp. 126, 127, 111 Ct.Cl. 487, 489–90 (1948), the court compared bad faith to actions which are "motivated alone by malice." In *Knotts, supra*, at 128 Ct.Cl. 500, 121 F.Supp. 636, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States*, 96 Ct.Cl. 186, 222 (1942), found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach [v. United States*, 147 Ct.Cl. 605, 614 (1959)], the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

*Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976). There is no evidence to overcome this high standard of proof, and plaintiffs have shown no intent by defendant to injure them.

But plaintiffs suggest that proof of bad faith need not be so stringent here because the main actor, Terranella, had acted less than honestly earlier in the transaction and this should be factored into the decision whether there is a triable issue of good faith in the termination decision. Apparently the argument is that if once a party acts in bad faith, in a generic sense, the presumption set out in *Torncello* and *Kalvar* does not apply thereafter. As best the court can tell, plaintiffs refer to Terranella's scheme to report the original commitment as a construction start allegedly for statistical purposes to satisfy his superiors and, perhaps, to keep funds from lapsing at the end of the fiscal year, when he knew that project would not be built. They apparently also object to his insertion of admittedly weak reasons in the file to overrule his staff's recommendations not to renew plaintiffs' amended firm commitment, and to keep it alive.

Although the record shows staff concern that there was no authority to substitute projects by amendment of the firm commitment, the record does not establish that the practice is improper. On the not implausible assumption that it was, however, plaintiffs do not advance their case because they participated in the artifice for their own purposes. Terranella may have achieved his intramural goal; but they retained the prospect of a potentially profitable business venture that otherwise may have been lost. To that extent, Terranella was acting in their interest.

▪ As for the refusal to follow staff recommendations to terminate plaintiffs' commitment, Terranella again was acting

in good faith toward plaintiffs whatever might be said about his fidelity to the housing policy. In the face of plaintiffs' increasingly questionable project, he held out against staff to give plaintiffs more time to come up with financing. This appears to have been an attempt to help them as much as possible for as long as possible. No one knew what turns the financial markets might take; Terranella's efforts might well have been sufficient to save the project for plaintiffs. As it turned out, they were not; financing was available a month too late. But none of this shows bad faith toward plaintiffs. Nor does defendant's failure to alert them to the fact that the March 1982 extension was the last. Neither the regulations nor the commitment require it, and both specifically limit the commitment period to 60 days at a time. There is no apparent reason why plaintiffs could not or did not stay on top of this significant matter on their own, or any suggestion the final decision was a secret. In any event, in light of the financial market, as defendant says, alerting plaintiffs in March would not have made any difference.

The record manifests that defendant acted fairly toward plaintiffs throughout the fifteen months it periodically renewed the amended firm commitment. In deciding not to renew it, HUD relied on evidence that the proposed project had significant problems in light of the then existing conditions of the housing market. This decision was reviewed and affirmed three times by HUD's Deputy Assistant Secretary.

Plaintiffs argue, however, that contrary to the findings of HUD, the termination of the commitment was without good cause because other projects would not have been adversely affected by Squirrel Creek, and there was a "substantial household need and market strength in the market area" for this development. They presented the Wilkinson report in support. In light of the conflicting conclusions of HUD and Wilkinson, they contend that it is an unresolved material fact whether there was proper justification for termination of the Squirrel Creek commitment. Even if these arguments are accepted, however, they are

not the proof of bad faith required by *Kalvar.* 543 F.2d at 1301. A well founded dispute over an administrative decision does not support a finding of bad faith by the government.

Nevertheless, plaintiffs contend that HUD acted in a "discriminatory and/or arbitrary and capricious manner in terminating the Squirrel Creek commitment on the inaccurate ground that there was no market for low-income and/or elderly housing in the Pontiac Township area while approving financing for a similar project that lies in close proximity to the Squirrel Creek project." They also say "politics" played a key role in the HUD decision to approve Phoenix Place instead of Squirrel Creek.

In HUD's view, however, the two proposed projects were significantly different from one another. The Deputy Assistant Secretary wrote that because the Phoenix Place project did not have a federally insured mortgage as Squirrel Creek would have had, "the financial risk is being underwritten by [the state] rather than HUD. The only potential loss to this Department for a non-insured project is Section 8 vacancy payments if a project has occupancy difficulties, compared to the payment of a mortgage insurance claim if an insured mortgage is assigned or foreclosed." So the projects were not directly comparable.

Because one of the reasons for rejecting the Squirrel Creek project was that it would "adversely affect" the housing market, plaintiffs also argue that the Phoenix Place project too should have been rejected because it would "adversely affect occupancy in existing federally assisted projects." *See* 24 C.F.R. § 883.206(a)(2). HUD made no finding that Phoenix Place should be rejected on that basis, and there is some evidence it should have. But the court cannot see how a different analysis of the Phoenix Place project could have affected Squirrel Creek.

In the last analysis, this was a discretionary executive decision to which the court must defer. It is presumedly correct and regular, *Citizens to Preserve Overton*

*Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and is due the most pronounced deference because it is within the expertise of HUD and is based on a weighing of record facts. *California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 782 (1986). The Deputy Assistant Secretary was presented with both the views of his subordinates and the conflicting ones of plaintiffs' consultant. He found the departmental position dispositive, and explained why. If he was mistaken, the court has no authority to second guess his decision. And even if Phoenix Place should not have been approved, this does not mean that the decision on Squirrel Creek was incorrect, or that the remedy for wrongful approval of one project should be wrongful approval of another.

The allegation that political considerations caused HUD to approve Phoenix Place but not Squirrel Creek is based solely on rumors and hearsay, which are not acceptable bases for relief. *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983). But even if HUD's decision to approve Phoenix Place was improperly motivated, there is no evidence of improper influences on the decision not to renew Squirrel Creek's firm commitment. Where executive decision making is not in the judicial or quasi-judicial context, congressional and other outside interference "in the process is actionable only if it imper-missibly affects the decision of the executive with the responsibility to decide." *Eagle Const. Corp. v. United States,* 4 Cl.Ct. 470, 479 (1984); *see Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers,* 714 F.2d 163, 169 (D.C.Cir.1983). The record indicates that state and municipal officials, developers, and perhaps politicians, sought to influence the decision on Phoenix Place, but no showing has been made that any untoward interjection of outside views affected the Squirrel Creek decision. So there is no reason to question the decision on that ground. If, on the other hand, plaintiffs mean to suggest that the mere fact of outsider intercession was actionable, the court would reject the argument. For the record shows they also secured congressional intercession with the Deputy Assistant Secretary on behalf of Squirrel Creek and it ill behooves them to complain of similar actions by others.

### Conclusion

Accordingly, it is ORDERED that defendant's motion for summary judgment is GRANTED and the case will be DISMISSED.