**DREXEL HERITAGE FURNISHINGS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Ethan Allen, Inc., Intervenor.**

**No. 661–83C.**

United States Claims Court.

Dec. 21, 1984.

See also, 4 Cl.Ct. 169.

Richard C. Johnson, Washington, D.C., for plaintiff. Stuart B. Nibley, David B. Apatoff, Bennett D. Greenberg of Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., of counsel.

Eileen P. Fennessy, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. David M. Cohen, Director, Washington, D.C., of counsel.

Robert H. Koehler, Washington, D.C., for intervenor. Patton, Boggs & Blow, Washington, D.C., of counsel.

## OPINION

TIDWELL, Judge:

This case began with the filing by plaintiff of a complaint seeking declaratory and injunctive relief and motions for a preliminary injunction and a temporary restraining order to enjoin defendant from making an award under General Services Administration (GSA) Request for Proposals (RFP or the Solicitation) FNPS–S7–1491–N–5–4–83, pending an opinion from the General Accounting Office (GAO) on a bid protest filed against this procurement by plaintiff, and a complete review of the merits by this court. One day prior to the Temporary Restraining Order (TRO) hearing, plaintiff filed its First Amended Complaint which requested the court to order a delay in award of the contract until resolution of a challenge by plaintiff to another offeror's compliance with the Walsh-Healey Act, 41 U.S.C. §§ 35–45.[1] The court allowed the First Amended Complaint to be filed.[2] Defendant thereafter filed a Motion for Summary Judgment and Opposition to Plaintiff's Request for Injunctive Relief. Ethan Allen filed a Motion to Intervene at the TRO hearing which was granted as a mat-

---

1. The "other offeror," who remained unidentified until the first hearing, was Ethan Allen, Inc.

2. The Department of Labor, the final arbiter of contractor in compliance with the Walsh-Healey Act subsequently determined on January 27, 1984 that Ethan Allen, Inc., qualified for the award as a manufacturer under the law and, as such, was eligible for award of the contract. The GAO opinion, B–213168, December 14, 1983 was favorable to defendant.

ter of right pursuant to RUSCC 24(a)(2). Two days later the court denied plaintiff's Motion for a Temporary Restraining Order. Plaintiff, at that point, withdrew its Motion for Preliminary Injunction and the court, at plaintiff's request, issued a call to the General Accounting Office, as per RUSCC 34(d), for an advisory opinion. The court received the GAO opinion, B–213168, December 14, 1983 which was favorable for defendant.

On December 20, 1983, the court denied Defendant's Motion for Summary Judgment. 4 Cl.Ct. 162. The pleadings submitted by the parties during those proceedings, and the ensuing oral argument identified three substantive issues and one procedural issue, any one of which, if proven, could show that plaintiff had been treated unfairly. The substantive issues were (1) did GSA improperly permit other offerors to propose the use of cherry wood but limit plaintiff to propose the use of mahogany wood for the 18th century English style (2) did GSA allow other offerors flexibility to propose furniture smaller than the minimum dimensions set forth in the amended RFP, but deny that flexibility plaintiff and (3) did GSA relax or abandon the requirements for "commerciality" in order to accept furniture of lesser quality from other offerors, without timely advising plaintiff that it could do so. Plaintiff's procedural charge is that it was treated unfairly because defendant misled plaintiff by failing to follow prescribed procurement procedures. The parties agreed that the case would be limited to these issues. However, shortly thereafter the court allowed plaintiff to add the "fill" issue to the list of substantive issues.[3]

Trial on the merits lasted from February 21, 1984 until March 16, 1984. At the close of trial, the court permitted plaintiff's Second Amended Complaint to be filed. An exhaustive amount of conflicting information was heard from plaintiff, intervenor and defendant on the issues, with very little agreement, even on the simplest of matters. The court has since reviewed the documentary evidence, testimony, legal arguments and briefs from the viewpoint of the separate entities, all having actual or potentially different vested interests, *i.e.,* Drexel, Ethan Allen, the General Services Administration, the State Department, Marvin J. Perry, Drexel's Washington, D.C. representative and Arndt & Arndt, Ethan Allen's Washington, D.C. representative, and has reached its decision. Plaintiff is not entitled to the relief sought and its complaint for declaratory and permanent injunctive relief is denied. The Complaint, the First Amended Complaint and Second Amended Complaint are to be dismissed. Furthermore, Plaintiff's Motion for Preliminary Injunction is moot and, therefore, dismissed.

## BACKGROUND

This action stems from a dispute over a negotiated procurement of furniture. On March 29, 1983, the General Services Administration (GSA) issued Request for Proposals (RFP) No. FNPS–S7–1491–N–5–4–83, to purchase pre-packaged quality household furniture for overseas use by the Department of State, though other agencies with similar needs could purchase furniture under the proposed contract.[4] The proposed contract was to be an indefinite quantity requirements contract for fiscal year 1984, with two one-year "renewal" options.[5] The contract would require the

---

3. The fill issue was a challenge by Drexel that Ethan Allen was not required to use the same high quality standard fill as used by Drexel.

4. For the previous 13 years, the Department of State conducted the procurement under a delegation of authority from GSA. In early 1983, GSA decided to conduct the procurement itself and accordingly withdrew the delegation of authority. The court notes that plaintiff had been the only Department of State contractor for

these goods and services and had been most recently awarded a contract in 1980. The two one-year options to extend the contract were exercised by State Department procurement officials.

5. Section H.4. of the solicitation advises offerors that "The Government has the right to unilaterally exercise its option to renew this contract for two (2) additional one (1) year periods without further competition." Section H.4 also states

contractor, upon proper notice, to quickly ship entire packages of commercially available household furniture for one, two and three bedroom houses to any location in the world. The purpose of the contract was to allow foreign service officers being posted overseas to select furniture quickly so that valuable time would not be spent locating and purchasing sufficiently high quality furniture commensurate with their positions as official representatives of the United States. The solicitation, as amended, specifically required offerors to propose furniture in a variety of sizes, styles, colors, fabrics, finishes, designs, and construction. It also required the successful offeror to propose interior designs for different rooms, pack and ship the furniture and set it up at its destination.

The following provisions of the RFP are the major requirements with which plaintiff takes issue in the procurement, or which are significant in describing plaintiff's substantive claims of unfairness.

Section C.2.A. of the RFP sets forth the requirements for the styles and designs which would be procured by defendant. It stated:

> The Government has, in the past contract, purchased homes of Italian Provincial/Transitional (Drexel Cameo), 18th Century English Design (Drexel 18th Century Classics) and Contemporary (Drexel Accolade II). For continuity, the Government will continue to purchase these three *designs*. Offerors may propose any or all of these 3 *styles*, but proposals must be for a complete home package.[6]

Section C.7.C, *"Special Conditions,"* entitled "Availability of Furniture for Inspection" required that the furniture be commercially available and set up a procedure to insure the commercial availability of the furniture offered. It provided in pertinent part:

> "Furniture offered in response to this RFP shall be inspected in the following manner. First, at a commercial outlet to become generally more familiar with the lines offered. Second, by submission of samples by the offeror to determine whether the furniture meets the specifications of the RFP. Third, at the point of manufacture of the best evaluated offeror(s). Failure of offerors to make furniture proposed available for inspection in any of the locations may be cause for rejection of the proposal.

> *"Furniture offered must be regular commercial lines of residential furniture.* Representative pieces form the line(s) offered should be available in commercial outlets for informal inspection. Formal inspection shall take place as outlined below, but the Government reserves the right to inspect furniture not especially presented or prepared for inspection by the offeror. The offeror should list at least three major commercial outlets where the line(s) offered are regularly sold and are on display in the Washington, D.C. area. If the lines proposed are not available in the Washington, D.C. area, outlets closest to Washington should be listed.... (Emphasis added.)

\* \* \* \* \* \*

> *"In the event a particular piece of furniture is not available for inspection at a commercial outlet or at the point of manufacture, inspection may be waived by the Contracting Officer*

"... that it is the intention of the Government to renew the contract if its terms are met."

6. The court has emphasized GSA's use of the words "designs" and "styles" because at times in the solicitation they are used improperly. There are sections of the solicitation where the words are similarly misused, and, interestingly enough, sections where they are reversed, thus used correctly. GSA, for all practical purposes used these key phrases interchangeably, even though testimony (in hindsight) was given that they intended to use the words correctly at all times. There was some discussion of this use, or misuse, of the terms at trial but it soon became evident to the court that, notwithstanding defendant's misuse of the terms at times, the offerors knew what defendant wanted. "Style" identified an era or place in time, whereas "design" meant the interpretation put to the style by a particular manufacturer or builder.

*and tentative approval of such pieces may be made by the Contracting Officer based on photographs, drawings, or a sample.* Such approval does not relieve the contractor from such responsibility for compliance with all other applicable provisions of this solicitation." (Emphasis added.)

\* \* \* \* \* \*

Section F.2. of the solicitation, *DESCRIPTION/SPECIFICATIONS,* informed offerors that furniture offered must be of comparable quality to the furniture provided by plaintiff in the 1980 contract awarded by the Department of State, *i.e.:*

Furniture offered must be comparable to overall quality of construction, materials, and workmanship to Drexel Heritage Cameo/Francesca, 18th Century Classics, and Accolade II lines. Attachment C of this RFP sets forth quality standards of Drexel Heritage furniture to guide offerors as to the quality levels required. *Furniture offered need not comply with every particular quality standard listed in sections A and B of Attachment C,* .... (Emphasis added.)

The RFP also set out the contract award criteria, and outlined the process for selecting a contractor. The criteria to be used for award included price, aesthetics, suitability, and other factors. Award would be based 90% on price and 10% on the remaining criteria. To aid in evaluating the offers defendant created a Source Evaluation Board (SEB) with four voting members, two from GSA and two from the State Department. The voting members included two furniture experts and two procurement experts, one each from the two agencies. The contracting officer, two other GSA officials and one State Department official completed the SEB as non-voting members.

The procedure for selecting the contractor provided that the voting members of the SEB would evaluate all proper offers and make a recommendation to the GSA Source Selection Authority (SSA), Mr. Vincent Burns. If the SSA approved of the

SEB selection, he would indicate that fact to the contracting officer and the contracting officer would make the award.

On April 6, 1983, GSA held a pre-bid conference with all prospective offerors to answer questions and clarify provisions of the RFP. Among other issues, questions were asked by prospective offerors about the requirements for style, design and the commerciality standard. GSA officials answered all questions pertaining thereto. Representatives of both plaintiff and intervenor were in attendance at the conference.

Following the pre-bid conference, the contracting officer issued Amendment No. 1 on April 18, 1983, in part to document and clarify answers given at the pre-bid conference and in part to amend portions of the RFP. A significant portion of this case turns upon whether amendment No. 1 "clarified" issues and how it changed some of the terms and conditions of the contract. Paragraph 18 of Amendment No. 1 stated:

"The furniture designs and styles referenced in this solicitation are *not* intended to provide a detailed description of acceptable items for this contract. *All reasonable responses shall be evaluated and be subject to rejection or acceptance of the proposed item. Designs and styles referenced herein are given as guidelines only to aid in establishing a base line for the type of furniture solicited."* (Emphasis added.)

Initially, the RFP contained very few definite size requirements for the furniture. At some point prior to April 18, 1983, the SEB decided to impose size requirements. One member of the SEB, prepared a list of what he considered acceptable dimensions from catalogues of potential offerors. There was dissention within the SEB as to whether sizes should be listed at all, whether they should be suggested sizes only, or whether they should be absolute minimums. The dimension requirements were finally stated in Attachment B to Amendment No. 1. Paragraph 12 of Amendment No. 1, the "Minimum Dimensions," contained the following language which represented the consensus of how

the minimum size issue would be addressed by the SEB:

> Based on previous history, the dimensions provided in Attachment B, pricing summary sheets, are the known acceptable minimum/maximum dimensions. Failure to offer these minimums may be cause for rejection.

On April 20, 1983, two days after issuance of Amendment No. 1, various members of the SEB attended the furniture mart in High Point, North Carolina. The purpose of the visit was to acquaint themselves with various lines of furniture already on, and coming on, the market and to introduce the board members to the styles and designs of furniture that could be the focus of the current procurement.

Thereafter, the SEB began preparations to evaluate the initial offers which were due on June 13, 1983. On that date four offerors submitted initial offers, including plaintiff and intervenor. These offers included voluminous detail which need not be repeated in its entirety here. It is enough to say that offerors submitted "picture boards" which, in this case, were approximately $3' \times 5'$ poster boards with photographs or catalog pictures of the offered furniture depicted along with sizes, wood finishes, various alternative upholstery materials and designs, and other information. The initial offers did not include samples of the actual furniture. That came a few months later. The SEB met several times over the next six weeks to evaluate each of the offerors' initial proposals. At the completion of the evaluation process of initial proposals, the SEB concluded that all offers were within the competitive range. FPR 1–3.805–1, *et seq.* The SEB determined that plaintiff's initial proposal was the only proposal which was acceptable without some degree of modification; *i.e.*, the proper styles were offered, the designs acceptable, the wood finishes acceptable, the sizes met the minimum sizes described in the RFP. The upholstered pieces were acceptable and all other "aesthetic and useful" requirements as set forth either specifically or by implication were acceptable to GSA. The SEB identified deficiencies in each of the other initial proposals and all offerors were notified of the results of the initial evaluation.[7]

From July 27, 1983 through August 2, 1983 the SEB met with each of the offerors, serially, to discuss the results of the evaluation of initial offers and, except in the case of plaintiff, to discuss deficiencies.[8] Two members of the SEB met with plaintiff on August 2, 1983 to discuss plaintiff's proposal. Since plaintiff's initial proposal was acceptable on its face, the SEB members limited discussion to informing plaintiff of certain changes in the requirements which had been adopted during the evaluation stage including those that are in issue in this case. Plaintiff had the opportunity, but raised no substantive issues at the meeting other than those previously raised and responded to by defendant.

Offerors were notified by letter of August 23, 1983 that furniture samples were to be provided for inspection by September 9, 1983. All offerors timely submitted furniture samples and on September 13, 1983 the SEB conducted an inspection of the bid samples. Deficiencies were discovered in at least a few samples of all offerors. Each offeror was then notified of the results of the inspection and required to submit additional samples to correct the noted deficiencies.[9]

---

7. Examples of deficiencies in the initial proposals included such factors as some pieces of furniture being too large, improper packaging for shipment, a specifically called for piece missing from the initial proposal, no accent wood on the piece as required, failure to use the required number of finishing steps, glass table tops not beveled, etc.

8. In an effort to properly promote competition, defendant is required, within limitations, to conduct negotiations with offerors within the competitive range but whose offers contain deficiencies. FPR 1–3.805–1, "General."

9. The SEB allowed, in some instances, offerors to certify that a particular change would be made in lieu of submitting another sample, as was permitted by the solicitation, as amended. Drexel was one of the offerors given this privilege, as was Ethan Allen.

On October 5, 1983 the contracting officer issued Amendment No. 6 to the solicitation and on October 7, 1983 offerors were advised by letter that best and final offers were due October 21, 1983. Amendment No. 6 contained, among other matters, a clarification of the commerciality standard and a statement that defendant intended to be flexible on the minimum dimension issue. On October 6, 1983 plaintiff requested a 30-day extension of time to analyze the amendment and consider a possible alternative to their offer. Five days later, on October 11, 1983 plaintiff asked that the procurement be halted pending explanation by defendant of what it wanted under the solicitation. Both requests were denied and best and final offers were received on October 21, 1983, as well as the remaining furniture samples which had been previously requested. The furniture samples were thereupon inspected and the best and final offers evaluated. The SEB determined that Ethan Allen's offer was most acceptable pending clarification of a few items. After receiving clarification, the SEB recommended Ethan Allen's proposal to the SSA for acceptance. The SSA approved the selection and on September 14, 1983 the contract was awarded to Ethan Allen.

## DISCUSSION

*Standard of Review*

■ This court has jurisdiction to review a pre-award contract decision made by a government agency pursuant to the Federal Courts Improvement Act of 1982, 28 U.S.C. 1491(a)(1) and (a)(3), *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983), and, once properly found, jurisdiction is not lost merely by award of the contract by the United States. *F. Alderete General Contractors, Inc. v. United States*, 715 F.2d 1476 (Fed.Cir.1983). Suit was properly filed in this case prior to award, and the court has retained jurisdiction. For a more detailed discussion of the court's jurisdiction in this case, *see Drexel Heritage Furnishings, Inc. v. United States*, 3 Cl.Ct. 718 (1983). As pointed out by defendant's counsel, the court is aware that its review

of defendant's decision to award the contract to the intervenor is limited and that the court should intervene in the decisional process only if the court can determine that the decisions were "irrational or unreasonable." *Baird Corporation v. United States*, 1 Cl.Ct. 662 (Cl.Ct.1983). The burden of proving that the decision was irrational or unreasonable is upon plaintiff who must establish its rights through clear and convincing evidence. *Princeton Combustion Research Laboratories, Inc. v. McCarthy*, 674 F.2d 1016 (3d Cir.1982); *Goldammer v. Fay*, 326 F.2d 268 (10th Cir.1964). This is not to say that defendant's pre-award decisions are unassailable. The standard of review for overturning the decision is high and such relief should be granted only if plaintiff can establish to the satisfaction of the court that there was little or *no* rational basis for defendant's decision to award a contract to a party other than plaintiff. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971). Moreover, citing language from the Senate Report on the Federal Courts Improvement Act of 1982, *supra*, Chief Judge Kozinski in *Quality Furniture Rentals, Inc. v. United States*, 1 Cl.Ct. 136 (1983) noted that, "Congress did not intend that this court consider every alleged irregularity ... but only those irregularities which would deny a contractor a fair opportunity to compete." *Id.* at pp. 140–141.

■ In light of these standards, the issue is did the defendant, acting primarily through the contracting officer, act in an irrational and unreasonable manner, thereby abusing his or her discretion in making the decision to award the contract to intervenor. There exists one further refinement to the principal issue in this case. In weighing whether a contracting officer acted in an irrational or unreasonable manner, the court must consider whether the procurement was formally advertised or negotiated. Here it was negotiated, and it is axiomatic that negotiated procurements require, in fact, demand, that the contracting officer be allowed more leeway or discretion in the decision-making process, than if

the contract was formally advertised. *Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361 (D.D.C.1970).

In *Drexel Heritage Furnishings, Inc. v. United States,* 3 Cl.Ct. 718 (1983), this court, in denying plaintiff's motion for a temporary restraining order, listed several guidelines which the court must follow in granting injunctive relief prior to the award of a contract. Those same guidelines, with one exception,[10] apply to the present situation where the court is asked to grant declaratory and permanent injunctive relief. The guidelines are summarized as follows:

(1) The likelihood of plaintiff's "Success on the Merits."

(2) The "Public Interest" including any overriding public interest which would warrant, in exercise of sound judicial discretion, a refusal to grant injunctive relief, even if plaintiff were likely to prevail on the merits.

(3) The possibility of any "Irreparable Injury" to the plaintiff if the injunction is not granted, including but not limited to, the absence of Adequate Remedy at Law and the possibility of any injury to others if the injunction is granted.

█ While the court must consider the same factors in granting permanent injunctive relief as it does in granting a temporary restraining order, the level of scrutiny which the court must employ is significantly higher. A temporary restraining order necessarily requires a lesser showing by plaintiff justifying such relief than does a permanent injunctive order. The rationale behind such distinction is quite simple. The potential for harm or disruption caused by a temporary restraining order is limited by its length; 10 days or, at maximum, 20 days. In contrast, a permanent injunctive order is without question more harmful to one of the parties because of its permanent nature.

Plaintiff, in this instance, carries a heavy burden in establishing a right to permanent injunctive relief in light of this court's denial of its motion for a temporary restraining order and its concomitant refusal to enjoin, even temporarily, award of the contract. However, the court found factual discrepancies and confusion which needed clarification to justify denial of Defendant's Motion for Summary Judgment, and to hold this trial. In order to persuade the court that it is entitled to declaratory and permanent injunctive relief, plaintiff, then, must prevail on each of the following three factors:

## I. SUCCESS ON THE MERITS

In order for the court to declare the contract invalid and permanently enjoin performance thereunder, plaintiff must, at this point, succeed on the merits. Plaintiff alleged that defendant had a legally enforceable duty to give full and fair consideration to plaintiff's proposal and that defendant breached that duty on several issues, *infra.* As was stated at the outset, the parties agreed to limit, for purposes of trial, the allegations of breach to four substantive issues and one procedural issue. Plaintiff, in its post-trial brief, recharacterized defendant's alleged breach as follows:

... defendant breached that duty in four significant respects: First, by relaxing the specifications for other offerors without fair notice to Drexel; second, by conducting impermissible technical leveling negotiations with offerors other than Drexel; third, by altering the evaluation procedures contained in the solicitation in favor of other offerors and to the prejudice of Drexel; and fourth, by construing the solicitation requirements in an arbitrary and capricious manner to avoid rejecting otherwise unacceptable offerors.

This change is a broader and more encompassing way of stating those issues

---

10. A factor to be considered in ruling on a motion for temporary restraining order and a motion for preliminary injunction is "The likelihood of plaintiff's success on the merits" (guideline No. 1 herein). In ruling on the Complaint asking for a permanent injunction and declaratory judgment, plaintiff *must* succeed on the merits. A likelihood thereof is of absolutely no value.

developed at the TRO stage of this litigation and offers no substantive change. There was no indication at trial or in the Second Amended Complaint that plaintiff intended by this recharacterization to change any of the original issues that were tried.

Defendant, with intervenor's support, counters that GSA fully and fairly considered plaintiff's proposal and that defendant's actions throughout the procurement were rational and not arbitrary and capricious. In addition, they allege that plaintiff is barred from seeking equity under the doctrine of unclean hands by arguing that plaintiff's actions throughout the procurement were such as to prevent the court from granting equitable relief.

■ It is well settled that the government owes a duty to a qualified offeror who submits an offer which complies with the terms of a RFP to fully and fairly consider that offer or bid under the solicitation and the prescribed procurement guidelines. *See, e.g., Eagle Construction Corp. v. United States,* 4 Cl.Ct. 470 (1984); *Ingersoll-Rand v. United States,* 2 Cl.Ct. 373, 376 (1983); *Heli-Jet Corp. v. United States,* 2 Cl.Ct. 613, 618 (1983); *Cecile Industries, Inc. v. United States,* 2 Cl.Ct. 690, 694 (1983).

Before focusing on the merits of the case, the court must address the issue of the doctrine of unclean hands raised by defendant and intervenor. The court has recognized that "[i]t is one of the fundamental principles upon which equity jurisprudence is founded, that *before a complainant can have a standing in court* he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands." (Emphasis in original.) *Dyn Logistics Service, Inc. v. United States,* 6 Cl.Ct. 353, 360 (1984).

"[T]he doctrine of unclean hands 'prevents a court of equity from granting relief to a plaintiff whose conduct has been unconscionable or tainted with bad faith' ... or 'if the applicant is guilty of misconduct, fraud or bad faith toward *the* party ... in connection with the transaction under consideration.' (Citation omitted.)" *Dyn Logistics Services, Inc.,* 6 Cl.Ct. 353, 360 (1984). The importance of the maxim, "He who comes into equity must come with clean hands" is highlighted in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814–815, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945).

... This maxim is far more than a mere banality. It is a self imposed ordinance that closed the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.... [This] maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."

*Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245–246, 54 S.Ct. 146, 147–148, 78 L.Ed. 293 (1933).

■ Thus, the court has broad discretion to refuse to aid a complainant whom, in its opinion, comes to the court with less than clean hands seeking equitable relief. *See Dyn Logistics Services, Inc.,* 6 Cl.Ct. 353, 360 (1984).

Allegations were made at trial against Mr. Marvin J. Perry, Drexel's official representative on this procurement and Drexel itself, by defendant and intervenor that he, and thus, plaintiff came to this court with unclean hands. This is based upon statements made at trial, principally by Mr. Burns, alleging that plaintiff's initial offer contained pictures of various pieces of furniture which were actually smaller than the minimum sizes called for in Amendment No. 1, but *stated* that they individually met the minimum dimensional requirements.

The court rejects this allegation of unclean hands. It is true that Mr. Perry represented in Drexel's initial offer that each piece of furniture proposed met or exceeded the minimum size requirement. It is also true that not all of Drexel's proposed furniture did meet the minimum

dimensions. Testimony was heard that there were 13 instances in which Drexel's furniture was below the minimum listed in the RFP, as amended. The court has reviewed those discrepancies and finds that Mr. Burns' allegations largely involve minor discrepancies. The RFP calls for one upholstered lounge chair, for example, 78 inches wide; that is the only dimension given in the RFP.[11] Drexel's chair, per their catalog is 77-½ inches wide. Mr. Perry offered the same chair as 78 inches wide; a one-half inch difference. It should also be borne in mind that this was an upholstered piece and one-half inch to one inch variances are not uncommon because of the way the upholstery is connected to the frame. Other items among the 13 have similar deficiencies. There are, however, a few instances where the sizes were more significantly different. For example, the RFP called for a table 20″ × 20″. Mr. Perry proposed a table 20″ × 20″ even though the corresponding table in the catalog is 16½″ × 16½″. He also proposed a dining room table as being 88″ long, as called for in the RFP, when, in fact, Drexel's table was only 80″ long with two 20″ leaves.

Because of the great number of pieces of furniture offered by each offeror, the court is surprised that there were not more discrepancies. Mr. Perry attempted to defuse the issue by laying part of the blame on the typists. Those pieces that exceeded minimum dimensions were stated with unfailing accuracy. Furthermore, Mr. Perry admits that some of the discrepancies were his fault, in that in the rush of preparing the offer some matters were just not taken care of that should have been. The dining table is an example. While under oath, Mr. Perry acknowledged that he knew of the discrepancy and that he had forgotten to correct it.

All-in-all the court cannot find Mr. Perry or Drexel guilty of violation of the doctrine of unclean hands. The evidence is insignificant and inconclusive. In fact, the court is of the belief that the only person harmed by these minor discrepancies was Drexel itself and Mr. Perry.[12]

### A. *Whether Defendant Relaxed the Specifications*

Plaintiff alleges that defendant relaxed the solicitation specifications during the course of the procurement without providing plaintiff with adequate notice in four areas. These include the style requirements, the minimum dimensional requirements, the commerciality requirement, and the fill requirement.

### (1) *Style Requirement "18th Century English"—Cherry v. Mahogany Wood*

The original solicitation, at Section C.2.A, called for three styles of furniture and listed three Drexel designs as representative of those styles. See footnote No. 5, *supra.* On April 6, 1983, at the pre-bid conference, GSA personnel attempted to clarify the confusion by notifying all offerors that they were required to conform their offers to the three style requirements listed in the solicitation but that the designs were flexible. Amendment No. 1, issued April 18, 1983 was intended to confirm that interpretation, but unfortunately the GSA drafter of the amendment, again utilized the terms style and design interchangeably. Based on the discussion at the pre-bid conference it is clear to the court that all offerors, including Drexel and Ethan Allen, knew that GSA was not limiting the furniture to be procured to the exact Drexel designs referenced in the solicitation, but was looking for the three styles. It is also clear that the Drexel designs listed were intended as guidelines

---

**11.** This claim is on page 92, item No. 2, of Attachment B to Amendment No. 1 of the RFP.

**12.** Using 20/20 hindsight, the court does not find it difficult to imagine that if plaintiff offered furniture that was smaller than the minimum dimensions contained in the RFP, and listed their *correct* sizes its August 20, 1983 negotiation with the SEB might have been quite different and much more meaningful to plaintiff than it ostensibly was.

only and all reasonable responses would be evaluated for acceptance or rejection. With that there is no dispute.

The crux of this portion of the dispute is whether the RFP, as modified by Amendment No. 1, permitted all offerors to propose furniture made of cherry wood, as did Ethan Allen, to satisfy the 18th Century English style requirement which traditionally is made of mahogany. If it was intended as such, was that provision relaxed by defendant during the procurement secretly, as alleged by plaintiff, by permitting intervenor to offer its 18th Century English line to be made from cherry, but not so informing plaintiff, thereby forcing plaintiff to offer its 18th Century English line made of mahogany. Plaintiff argues that since mahogany is, as a general rule, more expensive than cherry plaintiff was treated unfairly because its costs would be necessarily higher. The court notes, interestingly enough, that Drexel's best and final offer, which was based on the use of mahogany, was significantly less expensive than Ethan Allen's offer based on cherry wood. The reason Ethan Allen won the contract was because it offered much lower prices for other items contained in the price evaluation formula contained in the RFP. Plaintiff does not state how much of an effect the use of cherry wood would have on its best and final offer, thus, there is no way of determining whether it would have changed the standing of the offers, but it does not seem likely that such a change would enable Drexel to overcome the difference in excess of $800,000 that existed between these two proposals.

At trial, expert testimony provided by plaintiff unequivocally supported its argument that 18th Century English style furniture can only be made from mahogany. This is not the issue. The issue is what did GSA seek through this procurement. The only answer is 18th Century English style furniture that would satisfy the 1984 aesthetic tastes and practical uses desired by the State Department, as originally defined by Ms. McQueen and later Mr. Burns. Ms. McQueen's and Mr. Burns' testimony was consistent: cherry would suffice for the 18th Century English style. The record clearly shows that GSA would accept cherry, and, for that matter within reason, other kinds of wood. The court finds that "18th Century English" style furniture, as that term may be is interpreted by industry today can be made of woods other than mahogany. Drexel, despite its counsel's witnesses' protestations at trial, knows this to be the truth as Drexel too offers it in cherry wood.[13]

Plaintiff alleges that it was treated unfairly throughout the pre-award period because defendant "secretly" communicated to other offerors, but not to plaintiff, that furniture made from cherry was acceptable to defendant to meet the 18th Century English style requirement. Late in the procurement, plaintiff, using its Vintage Cherry line, complained that it too could have offered furniture made of cherry to satisfy the 18th Century English style requirement had it only but known it would be acceptable in lieu of mahogany. Plaintiff contends its offer was therefor given unfair treatment in relation with the other offers. Mr. Perry and Drexel officials met with Mr. Burns who told them that he would consider their Vintage Cherry line for the 18th Century English line but plaintiff refused to propose it, even as an alternative proposal on the alleged grounds that *they* thought the finish was too light. The court assumed that was Mr. Burns or SEB's decision. Mr. Burns, on the other hand, at about this same time period informed State Department officials that he would consider as acceptable any wood "similar" to mahogany, even if the manufacturer had to darken the stain in order to achieve the 18th Century English look. From the documentary evidence available,

**13.** A newspaper advertisement run in the *Washington Post* two or three days prior to trial invited customers to view Drexel's new line of "18th Century English" furniture made of *cherry* wood. It should also be noted that GSA and State representatives knew of Drexel's new 18th Century English line (Vintage Cherry) manufactured from cherry wood at least as early as the April 20, 1983 furniture mart, and perhaps even before then.

the court is of the opinion that this came as a surprise to State Department officials who did register at least one rather mild protest with GSA.

██ Plaintiff has resoundingly failed to substantiate its claim. As has been discussed, defendant was within its rights to solicit, consider and accept furniture made of cherry for the 18th Century English style requirement regardless of the desires of the State Department.[14] Most importantly though, plaintiff has failed to show how it was treated differently from other offerors due to any substantive improprieties by defendant. Based on the record, the court must find that plaintiff was aware from early in the procurement of GSA's interpretation of the style/wood requirement but for reasons known only to itself chose to ignore that fact. As noted earlier, on April 20, 1983, Mr. Perry attended the furniture mart in High Point, North Carolina with several GSA and State Department SEB members. Mr. Perry had obtained a copy of Amendment No. 1 by that time. As the SEB members wandered through various rooms at the Drexel showroom Ms. Susan Gaumer, the contracting officer, told Mr. Perry that he may wish to consider offering Drexel's Vintage Cherry line in response to the 18th Century English style requirement. Ms. McQueen, the State Department interior designer even asked Mr. Perry if Drexel was going to offer its new Vintage Cherry line. The response was "no."

This court is of the opinion that Drexel, including specifically Mr. Perry, knew from Amendment No. 1 issued April 18, 1983, and certainly from the furniture mart conversations with Ms. Gaumer and Ms. McQueen on April 20, 1983 that GSA considered that furniture made from cherry wood was acceptable to the contracting agency for the 18th Century English style. This very same information was imparted to Mr. Perry on several other occasions.

*Minimum Sizes*

Plaintiff next contends that defendant relaxed the specifications without providing adequate notice to it by considering pieces of furniture from some offerors below the minimum size dimensions set forth in Amendment No. 1, Attachment B. Plaintiff argued that if it had only known that it too could submit "undersized" pieces, it too could have offered smaller, less expensive pieces. Because it did not have this information plaintiff was forced to offer furniture that met the minimum size. Therefore, plaintiff offered larger and allegedly more costly pieces of furniture than Ethan Allen to plaintiff's detriment. The "detriment" argument put forth by Mr. Perry is that cherry is cheaper than mahogany; *a fortiori* cherry furniture is cheaper than mahogany. The court finds fault with this argument. Intervenor and defendant both testified, and plaintiff did not refute, that there is more wastage in cherry than mahogany, thereby putting them possibly on a par in terms of cost. Moreover, if the design work is more intricate on a cherry piece, the cherry can be more expensive than the mahogany.

██ As originally issued, the RFP contained very few size requirements. Amendment No. 1, Attachment B, however, set minimum sizes and offerors were advised that "[f]ailure to offer these minimum dimensions *may* be cause for rejection." It must be noted, however, that it did not state that rejection was automatic or that offerors were prohibited from offering furniture below the stated minimum sizes. In the opinion of the court, after review of the evidence presented, there was no "relaxation" of the minimum size requirement. The minimum size requirements contained in Amendment No. 1, Attachment B, were guidelines and provided for flexibility in dealing with individual pieces of the offerors' lines. This was fur-

---

**14.** The court admonished counsel for defendant and plaintiff on at least two occasions in open court that the alleged dispute between the State Department and GSA over the use of cherry wood instead of mahogany was a political issue to be decided within the Executive Branch of government, and not by this court.

ther publicized when all offerors were informed by defendant during the July 27—August 2 negotiations that the SEB intended to be flexible on the size issue. The size standard, which plaintiff wanted to have set in concrete was only a guideline for offerors in planning their various rooms and the furniture that would go in each room.

It is important to understand the practical ramifications of the "undersize" charge leveled by plaintiff. The contract, as amended, identified minimum sizes for each piece of required furniture but permitted offerors to offer furniture of a different size, *e.g.*, larger or smaller. In effect, it was a "ballpark" figure to impart offerors information as to the general sizes of furniture that the government wished to purchase. In the opinion of the court, if an item was smaller than the size given in the amended RFP, it was not "undersized," which connotes a negative factor, it was merely a piece of furniture that was less than the "ballpark" minimum figure. The real test for acceptability was whether the furniture met the aesthetic and practical uses required by the State Department, of which size could, but might not be a factor, and whether the furniture possessed enough of the style and design characteristics to be identified as the style for which they were offered.[15]

As the SEB reviewed the dimensions of the furniture offered, they evaluated each piece on a case-by-case basis to determine if it was aesthetically pleasing and functional. The SEB, at first, deferred to Ms. McQueen, the State Department interior designer, as to style, design and practicality for use. During the negotiation sessions with all offerors on July 27, 28 and August 2, Ms. Gaumer specifically told each offeror, including Drexel, that any piece of furniture smaller than listed in Amendment No. 1 could be offered and they would be evaluated on a case-by-case basis.[16] The purpose of the statement was to assure that every offeror knew that the SEB was flexible on the size issue. The SEB, however, specifically, and properly, declined to say how much of a deviation from the figure in Amendment No. 1, Attachment B, would be permitted. Rather, if an offeror wished to offer a piece smaller than specified in the RFP, they were told simply to submit it and it would be evaluated. Evaluation included discussing the piece with the offeror as proven by the fact that if a deficiency had been noted by the SEB during evaluation of the initial offer, the deficiency would be discussed at the negotiation table. In at least some instances, defendant pointed to, or described another piece in that offeror's catalog and said to the effect that if "this piece were to be offered it would be given serious consideration." In some of those instances the "suggested" piece was smaller than the minimum set out in the RFP. Thus, not only was the concept of size flexibility formally given to the offerors; proof was provided. Mr. Perry was likewise told of the new flexibility standard by Ms. Gaumer at his August 2, 1983 negotiation meeting with her, and she repeated it to him on September 20, 1983. Mr. Perry most certainly knew that the SEB was flexible on minimum sizes when the SEB pointed out on August 2, 1984 that Drexel had placed a top on a desk that had a different finish on it than did the bottom of the desk and was, therefore, unacceptable. Mr. Perry's explanation was that he had taken a larger desk top and put it on a different desk bottom because the latter had a top 2″ smaller than the minimum-size dimensions sought in the RFP. Ms. Gaumer suggested, and Mr. Perry agreed, to go back to the

---

**15.** As an example, one line of furniture offered for the 18th Century English style was rejected by Ms. McQueen as possessing "too many" 18th Century American design details. In another instance she rejected a contemporary offer because it was "ugly."

**16.** It was never directly addressed, but the court believes that the case-by-case analysis of pieces of furniture smaller than the indicated size in the RFP, as amended, was in addition to the review given all of the sample pieces required to be delivered to GSA or to the alternative review given some pieces by reviewing pictures of them and their specifications.

smaller top. The desk was then determined to be acceptable by the SEB. How blunt did the SEB have to be? Mr. Perry was told that he could be flexible on size, and then the SEB proved it to him.

Following receipt of furniture samples on September 9, 1983, the SEB began to review the samples. During the period of review, GSA discovered that Drexel may have been less than candid in their initial proposal with respect to the minimum sizes of some of its furniture. Plaintiff represented in its initial offer that each piece met the RFP minimum specification, though, in fact, there were 13 instances, where the pieces of furniture were smaller than the minimum size called for, but offered as meeting the minimum size standards listed in the RFP, as amended. This issue has been adequately addressed, *supra*, where the court found this to be an insufficient basis for an "unclean" hands claim.

The facts that surfaced at trial support defendant's and intervenor's contentions. Plaintiff was unable to convince the court that it was treated unfairly by any action of defendant on the minimum size issue. The SEB provided for size flexibility in the solicitation, as amended by Amendment No. 1, and the SEB was free to apply that flexibility standard as they saw fit so long as all offerors were given an equal opportunity to compete and were treated fairly. The fact that all proposals contained furniture smaller than specified, including Ethan Allen and Drexel and were considered by the SEB gives proof that all offerors were treated fairly.

Plaintiff's argument that Amendment No. 6 was the first time that it had definite knowledge of the flexibility offered by the SEB does not hold up after an analysis of the facts. Amendment No. 6 was not merely a belated announcement of the size flexibility as set forth in Amendment No. 1. Plaintiff, despite the knowledge it had, made a business decision in choosing what to submit in its proposal. In the opinion of the court plaintiff was not treated unfairly and cannot prevail on this issue.[17] The court can find no substantive differences between Amendment No. 1 and Amendment No. 6 on this issue, and merely ponders why it was done this way.

### The Commerciality Issue

Plaintiff next contends that it was treated unfairly because defendant relaxed the specifications by modifying the commerciality requirement without providing plaintiff with adequate notice. The RFP required that offerors propose regular "commercial lines of furniture" and, inherent therein, as confirmed at the pre-bid conference on April 18, 1984, proposals of other than commercial lines would not be accepted.

Plaintiff alleges that defendant relaxed the commerciality requirement in Amendment No. 6 by adopting a revised definition of commerciality and by eliminating a provision of the RFP that set up a procedure to verify that the furniture offered was indeed commercially availble to the general public. Finally, plaintiff contends that defendant relaxed the commerciality requirement by allowing offerors to submit complete lines of furniture which did not meet the commerciality test.

The court finds there is no substance to plaintiff's argument. In the first instance, plaintiff has failed to show that the commerciality standard was modified either by amendment or by action. The restatement of the commerciality requirement set forth in Amendment No. 6, in the

---

17. For the convenience of the reader, the court will set forth the two short portions of the amendments to the RFP we have been discussing.

Amendment No. 1, paragraph 7: "Offerors are hereby notified that furniture dimensions that do not meet the requirements cited in the solicitation will be reviewed and evaluated on a case-by-case basis as to their acceptability."

Amendment No. 6, paragraph 12.d.L.: *"Minimum Dimensions.* Based on previous history, the dimensions provided in Attachment B, Primary Summary Sheets, are the known acceptable minimum/maximum dimensions. Failure to offer those minimum dimensions may be cause for rejection."

opinion of the court, was nothing more than a clarification of the definition provided in the solicitation. The RFP simply stated: "Furniture offered must be regular commercial lines of residential furniture." Special Conditions, § 7.C.(1) of the RFP.

Plaintiff, interestingly enough brought to the court's attention that neither of the two definitions cited, *supra,* are applicable because a more comprehensive definition was included in the RFP at Section L, General Provisions clause, 92A (1/83) No. 6, at page 64 of the RFP, entitled <u>SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN (NEGOTIATED)</u>, which states, in pertinent part that "(T)he term "commercial products" means products in regular production sold in substantive quantities to the general public and/or industry at established market or catalog prices." The court, however, respectfully disagrees with plaintiff. Clause 92A has no effect or input upon this issue because (1) it is not applicable to the contract itself but to subcontractors and (2) it is addressed to regular purchases to the general public *and industry.*

The court finds that to the extent that commerciality needs further defining, the parties need look no further than FPR 1-3.-807-1(b)(2)(B), *infra,* which, while the introductory words are slightly different than the language contained in Amendment No. 6, the substance of the two clauses are verbatim. The court finds that the term and concept of "commerciality" in this contract is furniture which: "(1) is regularly used for other than Government purposes and (2) is sold or traded in the course of conducting normal business operations."

It was the purpose of the defendant to buy high-grade furniture that was, or would be, coming into production for retail sale at regular commercial outlets. The government did *not* want to purchase furniture that was specifically manufactured for this contract for fear that it would be of less quality and desirability than furniture with a proven sales background to the general public. The acid test was, had the line of furniture and its individual pieces

been successfully sold through commercial outlets to non-government purchasers. More importantly, plaintiff did not offer proof at trial that any furniture considered by defendant failed to meet this standard, and, for the record, all of the lines offered did meet the commerciality standard. While the court is, therefore, at somewhat of a loss to understand the need for this portion of Amendment No. 6, paragraph 2, it nevertheless finds that there was no relaxation of the commerciality standard by written amendment or by defendant's actions.

Plaintiff also argues that in evaluating offered pieces of furniture, the defendant permitted offerors limited latitude from the commercial design by permitting modifications to individual pieces of a line of furniture to make them more acceptable to the SEB's aesthetic and practical use test. That is true. All offerors, *including Drexel,* made minor modifications to pieces of furniture in their offered commercial lines in order to comply with other requirements of the solicitation. The court doubts very seriously if any one offeror manufactured a line that met *every* requirement of the Solicitation, and, after listening to testimony for nearly a month and reviewing the thousands of pages of documents, the court is convinced that a small exception process needed to be included in the RFP, otherwise there could have been no offerors, or perhaps just Drexel without competition. Despite plaintiff's protestations, the court finds there were simply no major modifications to lines offered by any offeror.

■ Finally, plaintiff argued that defendant treated it unfairly by eliminating the rather rigorous inspection requirements set out at paragraph C of the Special Conditions of the RFP. Granted, the purpose of inspecting furniture at local outlets was to become familiar with the individual styles and designs and to assure defendant that the offered lines actually were sold commercially. If the inspection procedures were totally eliminated, there might well be a problem, but that was not the case here. Defendant replaced the inspection proce-

dures outlined in the RFP with a procedure designed to accomplish the same purpose, but in a shorter time frame, at less cost to the government and more effective.

The court finds that plaintiff's contention is without merit. In the opinion of this court all the parties knew throughout the course of the procurement of defendant's interpretation of commerciality, including plaintiff, and all were treated equally. Defendant "relaxed" the inspection regulation to the extent it granted to itself the right to more quickly and efficiently determine that the furniture lines offered under the solicitation were regularly used for other than government purposes and were sold or traded in the course of conducting normal business operations. Plaintiff cannot prevail on this issue.

### The "Fill" Issue

Relatively late in the discovery process, plaintiff thought it had discovered another major failure by defendant by which it could prove that intervenor had received more favorable treatment than plaintiff. This is identified as the "fill" issue because it dealt with the quality of fill that offerors must use in the upholstered pieces of furniture in their offer. Fill is the material that goes into the cushions and other parts of upholstered pieces. The court has carefully read the complete record in this case and spent much extra time specifically looking for any guidance in the RFP, testimony or exhibits, to lead it to a conclusion of the fill issue. All to no avail. There was brief testimony on the issue, but that testimony only strengthened intervenor's position that it met the necessary overall quality standards of Drexel's fill as required by Amendment No. 1, April 18, 1983. There is mention of upholstery in the RFP at Section F.3., which requires offerors to meet Drexel's upholstery standards as set out in Attachment "C." But that is of no assistance because there is nothing in the record equating fill to upholstery. Moreover, defendant failed to state in Attachment "C" any Drexel upholstery standards, much less any Drexel fill standards.

Plaintiff countered that intervenor nevertheless had to adhere to the requirement set forth in the RFP that all furniture must meet Drexel's quality level, including its fill quality, and that by failing to state in its offer what fill intervenor intended to use in its offered upholstered furniture, intervenor received beneficial treatment at plaintiff's expense.

The court agrees with defendant; this contract contained no fill standard and plaintiff cannot be permitted to create one from whole cloth.

 Even so, intervenor provided defendant with a sample piece and a cut-away illustration of its upholstery indicating the type of fill it was proposing. Intervenor also provided defendant with an "Assurance of Quality" that its upholstery met or exceeded all of Drexel's standards. The burden is, therefore, on plaintiff to prove its charge. The court is of the opinion that Intervenor did what it could under the circumstances and the court is satisfied. In the opinion of the court, plaintiff was not treated unfairly and cannot prevail on this issue.

Before progressing to the next issue, the court will speak to an issue raised by plaintiff that could possibly have a bearing on the fill issue. Plaintiff provided a number of letters addressed to Drexel officials, written by various people who proclaim themselves experts on this matter, stating that beyond doubt 8-way hand tied springs are always, without exception, superior to "drop-in" springs. Drexel used 8-way hand tied springs and Ethan Allen used drop-in springs. If this is the "fill" issue, the result is unchanged. Neither party addressed the 8-way hand tied springs to drop-in springs at trial through testimony, though defendant had evaluated the drop-in springs against the Drexel 8-way hand tied quality standard. Defendant's own furniture experts and an independent furniture expert under contract to defendant concluded that Ethan Allen's drop-in springs were at least equal to Drexel's 8-way hand-tied springs. As Mr. Burns, the SSA said, "the

decision was mine and I accepted Ethan Allen's drop-in springs."

### B. The Evaluation Process

Plaintiff's final issue constitutes a challenge to the evaluation and selection process used by GSA throughout the procurement and has raised several issues which the court must consider in evaluating the validity of the current contract award. Plaintiff contends that certain procedural irregularities in the procurement process caused by defendant's actions justify granting the relief sought. These irregularities include, plaintiff alleges, improper technical leveling, alteration of evaluation procedures during the procurement which favored other offerors, unfair construction or interpretation of the RFP to improperly keep other offers technically acceptable, and failure to extend the deadline for submission of best and final offers at plaintiff's request to allow plaintiff to prepare an offer in conformance with Amendment No. 6.

Plaintiff first complained that defendant violated applicable procedural guidelines by performing technical leveling which resulted in unfair treatment to plaintiff. Plaintiff contends that defendant conducted discussions with other offerors to bring their proposals up to the minimum technical level acceptable, and this constitutes impermissible technical leveling. Plaintiff cites to a plethora of cases directing the court's attention to bits and pieces of dicta which, at first glance, appear to support its position. However, upon closer examination, as aptly pointed out by intervenor, a reading of the cited portions in context shows that the cases do not support plaintiff's position, but rather uphold the contracting officer's actions. The facts distinguish the present case from the cited cases.

 Plaintiff cites by analogy to Section 2304 of Title 10 of the United States Code. This section requires that written or oral discussions be held with all responsible offerors determined to be within the com-

petitive range, or capable of being brought within the competitive range. However, Section 2304 is part of the Armed Services Procurement Regulation and is applicable only to the military services and the National Aeronautical and Space Administration. For purposes of our discussion, we will use the comparable procurement regulation for purchases by civilian agencies, including GSA, the Federal Procurement Regulations (FPR). FPR 1–3.101, 1–3.804 and 1–3.805–1 provide substantially the same provisions for the civilian agencies. FPR 1–3.804 states, in pertinent part:

> Oral discussions or written communications shall be conducted with offerors to the extent necessary to resolve uncertainties relating to the purchase or to the price to be paid.

 The court recognizes that contracting officers have a wide range of discretion in deciding when, under what circumstances and the topic or range of the discussions.[18] In *Food Science Associates, Inc.*, Comp.Gen. B–183054, 75–1 CPD ¶ 269 (1975), the Comptroller General stated:

> We have held that no inflexible rule can be used to determine compliance with the requirement for written or oral discussions but rather that the content and extent of discussions in negotiated procurements is a matter of judgment for determination by the procuring agency on the basis of the particular facts of each case. The procuring activity's determination in this regard is not subject to question by our Office unless clearly arbitrary, provided that the discussions held do not operate to the bias or prejudice of any competitor. 52 Comp.Gen. 161 (1972); 54 Comp.Gen. 60 (1974); In The Matter of American Maintenance and Management Services, Incorporated, B–179126, February 12, 1974; In The Matter of Gulton Industries, Incorporated, B–180734, May 31, 1974....

**18.** The terms "discussions" and "negotiations" are used synonymously. 51 Comp.Gen. 102 (1977).

That guideline is clearly applicable to this case. The court is of the opinion that the content and extent of negotiations are to be left to the discretion of the procuring agency and that discretion should not be questioned unless it is clearly shown to be without a rational basis.

Plaintiff, however, specifically complains that defendant carried the discussions with other offerors beyond acceptable limits to the extent that the SEB pointed out specific weaknesses in competitors' proposals and even suggested that if a particular alternative piece of furniture in the offerors' catalog were offered, it would receive full consideration for acceptance as part of the line. Plaintiff contends that this constitutes impermissible technical leveling and that as a result it was unable to compete on a fair and equal basis with other offerors because defendant only assisted plaintiff's competitors in this manner.

 We agree that it is improper to bring an original inadequate proposal, outside of the competitive range, up to the level of an adequate proposal by pointing out weaknesses which were the result of the offerors own lack of diligence, competence or lack of inventiveness in preparing the proposal. 51 Comp.Gen. 621, 622 (1972). However, an agency is required to conduct meaningful discussions with offerors in order to obtain best and final offers most advantageous to the government. 50 Comp.Gen. 202 (1970). FPR 1–3.801.1 states that, "It is the policy of the Government to procure property and services from responsible sources at fair and reasonable prices calculated to result in the lowest overall cost to the government." Thus an agency, during the course of discussions, is encouraged to point out weaknesses, in a general sense, to an offeror's proposal, but without discussing proprietary or inventive items of *other* offerors. All of this is designed to insure maximum competition. Moreover, the technical leveling discussions that plaintiff accuses defendant of engag-

ing in with the other offerors occurred during the negotiations held individually from July 27 until August 2, 1983. At that session defendant had not yet learned that plaintiff had inadvertently misrepresented the sizes of at least two pieces of furniture. Corrections were made based on Mr. Perry's explanations and suggestions from the SEB on how to cure the deficiencies in its initial offer. Defendant became more involved in the same manner with Ethan Allen because more unsatisfactory pieces were contained in its initial offer, but neither instance constituted improper technical leveling.[19]

Upon consideration of the documentary evidence and testimony in the present case, the court cannot find that the agency's actions were without some rational basis and that defendant conducted impermissible technical leveling. To the contrary, the court is of the opinion that plaintiff was treated fairly and any failure on the part of plaintiff to submit a more competitive proposal can be attributed solely to plaintiff's refusal to take advantage of the flexibility permitted it in the RFP.

Plaintiff next contends that defendant altered the normal evaluation procedures for the procurement to favor other offerors thus causing plaintiff to be treated unfairly. During the course of the trial plaintiff attempted to show that defendant failed to review alternate offers as thoroughly as it did the original offers thus performing an "unfair" evaluation of alternate samples, by calling for best and final offers prior to receiving acceptable samples from all offerors, by accepting furniture samples for inspection after submission of best and final offers; and by conducting negotiations with one offeror after the submission of best and final offers.

 The court is unable to find, through either believable documentary or testimonial evidence, that defendant altered the evaluation procedures or that the evaluation procedures favored a particular

---

**19.** The court accepts the GAO definition of technical leveling. Technical leveling is the disclosure of "... one proposer's innovative or inge-

nuous solution to a problem ..." B–173677, 51 Comp.Gen. 621, 622 (1972).

offeror or that plaintiff was treated unfairly. There is no rule requiring that a particular or equal amount of time must be spent in evaluating offers. Defendant's duty was to insure that each offer, including alternate offers, received fair consideration. While plaintiff alleges that defendant applied less stringent standards to the review of Ethan Allen's alternate offers than it did to the initial offers, plaintiff has failed to prove to the satisfaction of the court that such was the case. *General Electric Co. v. Seamans*, 340 F.Supp. 636, 640 (D.D.C.1972).

The allegations regarding any impropriety surrounding the submission of best and final offers is similarly unfounded. In calling for best and final offers prior to having received acceptable samples from all offerors, defendant did not treat plaintiff unfairly. No offeror, including plaintiff, had completed submission of acceptable samples by October 21, 1983, the date for submission of best and final offers.

To be more specific, it was time that Ethan Allen's contemporary line, had not been found acceptable at the time best and final offers were required. By letter of October 7, all offerors were instructed to deliver best and final offers *and* the required new samples. Award was made contingent upon a finding that the samples were acceptable. Ethan Allen's line was found to be acceptable and it was subsequently awarded the contract. It is clear that all offerors were treated equally, but, more importantly, Drexel was not treated unfairly.

■■■■ As for the contention that defendant conducted impermissible negotiations with one offeror after submission of best and final offers, the court finds the allegation to be without merit. Negotiations occur only where there exists an opportunity for an offeror to modify or revise its proposal. *General Electric Company v. Kreps*, 456 F.Supp. 468, 473 (D.D.C. 1978). In this case, the contracting officer noticed arithmetic errors in stated cubic measurements for cartons or containers within which the furniture would be shipped. In fact, there were several questions about Ethan Allen's proposal that needed to be clarified. The clarifying questions were asked by the contracting officer and Ethan Allen answered them by explaining the arithmetic errors and certifying that certain quality changes would be incorporated into furniture delivered under the contract. The court is of the opinion that those discussions constituted "clarifications" and did not rise to the level of impermissible negotiations.

■■■■ Plaintiff also contends that it was treated unfairly when the contracting officer refused to grant its request for an extension of time for submission of best and final offers. In reality plaintiff had almost seven months to plan and put together an offer that could have met the terms of the RFP, and have been competitive. The court finds absolutely no merit in this allegation. Plaintiff has offered a wealth of rhetoric and a dearth of substance in support thereof.[20] Plaintiff has not convinced the court that defendant's denial of plaintiff's request for an extension of time was without a rational basis, therefore, it must stand.

Finally, plaintiff contends that defendant unfairly construed the solicitation in an effort to keep all offers technically acceptable. While this procurement may be far from a model procurement, it is the opinion of the court that plaintiff was not injured or treated unfairly by the actions of defendant. The misunderstandings or ambiguities resulting from GSA's handling of the procurement did not in the final analy-

**20.** Instead, plaintiff chose to stand with its unchanged offer, which they felt had pleased the State Department in the 1980 procurement, and to ignore the latitude given offerors by GSA in the 1983 procurement. Drexel has contracted with the government before and knows perfectly well how to compete for a contract. Drexel's witnesses, especially Mr. Perry, demonstrated a considerable depth of procurement knowledge. Why plaintiff chose to continue on the course it had originally set for itself will probably never be known. With all of the information that was known to Drexel about this procurement, its failure or refusal to use that knowledge is uncanny. It has never been adequately explained to the court's satisfaction.

sis prejudice plaintiff. Plaintiff has thus failed to show that it is entitled to prevail on the merits; a necessary showing if the court is to grant permanent injunctive relief.

## II. PUBLIC INTEREST

In light of plaintiff's failure to prevail on the merits, it is clear that the public interest requires denial of declaratory and injunctive relief. As we stated in the denial of the motion for the temporary restraining order.

> It is in the public interest to preserve the integrity of the procurement process. Plaintiff has failed to show that it did not have an opportunity to compete on an equal basis with other offerors in spite of alleged irregularities in the procurement process.

Even if the court were to find that there was a violation of the Federal Procurement Regulations, plaintiff would have to overcome demonstrative high public interest before it would be allowed to disrupt the procurement process. *Planning Research Corp. v. United States*, 4 Cl.Ct. 283, 292 (1983).

With each contract award there are an untold number of disappointed offerors or bidders. Allowing a complaint akin to Drexel's to trigger unfettered exercise of equitable power by this court might well result in broad judicial interference with the administration of government contracts. The strong government interest in an orderly, efficient, expeditious government procurement process must be recognized and maintained.

▇▇ The court views the public interest as a balancing of the competing goals of preserving the integrity of the procurement process against the government's interest in the efficient procurement of goods. *Isometrics, Inc. v. United States*, 5 Cl.Ct. 420, 425 (1984).

## III. IRREPARABLE INJURY/ADEQUATE REMEDY AT LAW

Plaintiff has been provided a full opportunity to pursue its remedy at law through a trial on the merits and has failed to convince the court that it should prevail. In light of the court's holdings on the first two factors which must be considered in granting equitable relief there is no need to further explore this final factor. (*Isometrics, Inc. v. United States*, 5 Cl.Ct. 420, 426 (1984)).

## CONCLUSION

It is, therefore, ordered that plaintiff's request for declaratory and permanent injunctive relief is denied and plaintiff's second amended complaint is to be dismissed.

IT IS SO ORDERED.